IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| DOUGLAS I. HORNSBY, ADMINISTRATOR OF THE ESTATE OF CYNTHIA GARY,<br><br>    Plaintiff,<br><br> v.<br><br>UNITED STATES of AMERICA,<br><br>METRO MACHINE, CORP. d/b/a GENERAL DYNAMICS NASSCO-NORFOLK,<br><br>HARBOR INDUSTRIAL SERVICES, INC.,<br><br>COASTAL MECHNICAL SYSTEMS, LLC,<br><br>ADVANCED INTEGRATED TECHNOLOGIES, LLC,<br><br>KD SHIPYARD REPAIRS, LLC<br><br>and<br><br>CECO ENVIRONMENTAL CORP.,<br><br>    Defendants. | Case No. 2:22-cv-427 |

**HARBOR INDUSTRIAL SERVICES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

NOW COMES Harbor Industrial Services, Inc. (hereinafter, "Harbor"), by counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rules 7 and 56, and submits the following Memorandum in Support of its Motion for Summary Judgment.

**INTRODUCTION**

The Plaintiff's tort claim against Harbor is barred by the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* (hereinafter, the "LHWCA" or the "Act"). Under the LHWCA, covered employees are prohibited from bringing personal injury actions against their

1

employer(s) and are, instead, left solely with those remedies afforded through the Act. The LHWCA is a no-fault compensation scheme that requires an employer to pay compensation to an employee—without any showing of negligence—in exchange for immunity from tort liability, regardless of the existence or seriousness of its own fault.

An "employer" under the LHWCA, is merely an entity that employs employees engaged, partially or wholly, in maritime employment upon or adjacent to the navigable waters of the United States. And while the LHWCA itself does not specifically adopt the "borrowed servant doctrine" common to state workers' compensation jurisprudence, the Fourth Circuit and various other federal courts have long held that "employer" status under the LHWCA extends to both a general and a borrowing employer alike. Accordingly, the statutory benefits provided by the LHWCA are the *exclusive* remedies a borrowed employee may pursue against both their general *and* their borrowing employer for workplace personal injury or death.

## STATEMENT OF UNDISPUTED FACTS

1. Blue Staffing Agency, LLC (hereinafter, Blue") is in the business of furnishing skilled labor to other marine and industrial companies. *See* Cordero Aff. at ¶ 4.[1]

2. Harbor is in the business of providing ship repair services to commercial and government vessels. *See* Fajardo Aff. ¶ 5.[2]

3. Rolando Fajardo is the sole owner and President of Harbor. *See* Fajardo Aff. at ¶ 4; Cordero Aff. at ¶ 3.

4. Rolando Fajardo owns 50% of Blue. *See* Cordero Aff. at ¶ 3.

---

[1] Yeidy Cordero's sworn affidavit is attached hereto as **Exhibit 1**.
[2] Rolando Fajardo's sworn affidavit is attached hereto as **Exhibit 2**.

5. Yeidy Cordero owns 50% of Blue and is the President of Blue. *See* Cordero Aff. at ¶ 3.

6. In 2021, the majority, if not all, of Blue's staffing contract agreements were with Harbor for the provision of temporary skilled labor. *See* Cordero Aff. at ¶ 8.

7. Ms. Gary was hired by Blue as an at-will temporary employee on February 17, 2021. *See* Cordero Aff. at ¶ 13.

8. Blue and Harbor entered into an agreement in which Blue would provide skilled labor (also referred to as Temporary Employees) to Harbor to work on Harbor's projects (hereinafter, the "Agreement"), a true and correct copy of which is attached hereto as **Exhibit 3**. *See* Cordero Aff. at ¶ 11, Fajardo Aff. at ¶ 11.

9. The Agreement provides:

> 14. <u>Temporary Employee assignments</u>: Customer [Harbor] is responsible for **assigning, directing, and controlling the work of Temporary Employees**. Customer may assign a Temporary Employee to supervisory tasks and roles for which the Temporary Employee is qualified, and Customer [Harbor] **retains sole responsibility for any act or omission** of such a Temporary Employee while in a supervisory role.
>
> Temporary Employees may **only work under the supervision, direction, or control of Customer** [Harbor], or other Temporary Employees assigned by Customer [Harbor] to a supervisory role. Customer's [Harbor's] rights under this Agreement may not be assigned to any other person or entity without Blue's express written prior consent to the specific assignment.

*See* Agreement at p. 3. (emphasis added).

10. Under the Agreement, Harbor agreed to pay Blue a sum based on the actual hours worked by Blue's Temporary Employees on Harbor's projects. In turn, Blue would pay its temporary employees, including Ms. Gary, based on the rates outlined in the Agreement. *See* Agreement at p. 1 and 7.

I-2612148.1

11. The amount Harbor paid to Blue was more than the amount Blue paid its employees, including Ms. Gary, assigned to Harbor, with the difference in the two sums resulting in part from Blue's being responsible for paying employee benefits, including health insurance and workers' compensation insurance premiums. *See* Cordero Aff. at ¶ 12.

12. Blue interviewed Ms. Gary with the expectation of assigning her to work for Harbor—and only for Harbor—if she was hired by Blue, per the Agreement. *See* Cordero Aff. at ¶ 13.

13. The only reason Blue hired Ms. Gary was so that she could immediately be assigned to work for Harbor. *See* Cordero Aff. at ¶ 13.

14. Ms. Gary was hired by Blue on February 17, 2021, with the intention of assigning her to work for Harbor as a fire watch. *See* Cordero Aff. at ¶ 13.

15. As soon as she was hired by Blue, Ms. Gary was assigned to work for Harbor as a fire watch. *See* Cordero Aff. at ¶ 14.

16. February 22, 2021 was Ms. Gary's first day of work as a fire watch for Harbor. *See* Cordero Aff. at ¶ 14, *See* Fajardo Aff. at ¶ 13.

17. Harbor determined the daily and weekly schedules that Blue's employees assigned to it would be required to work. *See* Fajardo Aff. at ¶ 12.

18. On February 22, 2021, Ms. Gary arrived at General Dynamics NASSCO-NORFOLK's (hereinafter, "NASSCO-NORFOLK") shipyard and reported to the Harbor trailer for her daily work assignment and morning briefing by a Harbor supervisor. *See* Fajardo Aff. at ¶ 18.

19. Ms. Gary worked for Harbor—and only Harbor—on February 22-26, 2021, March 1-3, 2021, March 8, 2021, and March 15, 2021. Ms. Gary was not assigned to work for any other

employer during that period, nor did she work for any other employer during that time. *See* Cordero Aff. at ¶ 28, Fajardo Aff. at ¶ 25.

20. Each day Ms. Gary worked; she received individual assignments from a Harbor supervisor. *See* Fajardo Aff. at ¶ 18.

21. Ms. Gary was required to inform her Harbor supervisor if she would not be present at work for any reason. *See* Cordero Aff. at ¶ 15, Fajardo Aff. at ¶ 24.

22. Ms. Gary was also encouraged by Blue to inform Blue if she would not be present at work, for recordkeeping purposes. *See* Cordero Aff. at ¶ 16.

23. Ms. Gary received her paycheck from Blue. *See* Cordero Aff. at ¶ 17.

24. Blue maintained Ms. Gary's employment and payroll records. *See* Cordero Aff. at ¶ 18.

25. Blue retained the authority to terminate Ms. Gary's employment. *See* Cordero Aff. at ¶ 19.

26. At all times relevant to this action, Harbor had the authority to terminate the assignment of any Blue temporary employee assigned to it, including Ms. Gary. *See* Cordero Aff. at ¶ 19, Fajardo Aff. at ¶ 14.

27. At all times relevant to this action, Harbor had the authority to direct any Blue temporary employee, including Ms. Gary, to leave the worksite and not return to it without Harbor's permission. *See* Fajardo Aff. at ¶ 14.

28. Harbor was a subcontractor for Coastal Mechanical Systems, LLC (hereinafter, "CMS"). *See* Fajardo Aff. at ¶ 21.

29. On February 22-26, 2021, March 1-3, 2021, and March 8, 2021, Ms. Gary was assigned by Harbor to work as a fire watch aboard USS McFAUL. *See* Fajardo Aff. at ¶ 25.

30. Each day Ms. Gary arrived at NASSCO-Norfolk, she reported to the Harbor trailer for her morning briefing by Harbor, completed a Harbor timesheet, attended a Harbor safety toolbox talk, was provided her assignment for the day by her Harbor supervisor(s), and then walked with the other Blue temporary employees assigned to Harbor to USS McFAUL to begin her assigned work. *See* Fajardo Aff. at ¶ 18.

31. Harbor provided Ms. Gary, and any other Blue employee working for Harbor aboard the USS McFAUL, with the equipment required for them to perform the contracted work. *See* Fajardo Aff. at ¶ 23.

32. On the day of the Accident, Ms. Gary was working aboard USS McFAUL, afloat on the navigable waters of the United States. *See* Compl. ¶ 1.

33. On the day of the Accident, Ms. Gary was working as a fire watch, a category of harbor worker, within the meaning of the LHWCA. Compl. ¶ 2, Fajardo Aff. at ¶ 25.

34. On the day of the Accident, Ms. Gary's immediate supervisor was Maliry Gonzalez. *See* Cordero Aff. at ¶ 29, Fajardo Aff. ¶ at 26.

35. It was Harbor that assigned Ms. Gonzalez, a Blue employee, to be a first-level supervisor aboard USS McFAUL. *See* Cordero Aff. at ¶ 30, Fajardo Aff. at ¶ 27.

36. As a first-level supervisor, Ms. Gonzalez ensured that Harbor safety protocols were being followed aboard the USS McFaul. *See* Fajardo Aff. at ¶ 29.

37. Ms. Gonzalez reported directly to James Marshall. *See* Fajardo Aff. at ¶ 28.

38. Mr. Marshall was a Harbor employee and the Superintendent of the project on which Ms. Gary was working. *See* Fajardo Aff. at ¶ 26.

39. Mr. Marshall assigned Ms. Gary, and other Blue employees, their daily job duties. *See* Fajardo Aff. at ¶ 30.

40. Mr. Marshall and Ms. Gonzalez regularly met with and monitored Ms. Gary's, and other Blue employees', work. *See* Fajardo Aff. ¶ 31.

41. Ms. Gonzalez did not report to any Blue employee in connection with the work either she or Ms. Gary did aboard USS McFAUL. *See* Cordero Aff. at ¶ 31.

42. Ms. Gary's work aboard USS McFAUL was overseen by Mr. Marshall. *See* Fajardo Aff. at ¶ 32.

43. On March 15, 2021, Ms. Gonzalez instructed Ms. Gary to wait, in a designated spot, on the main deck of USS McFAUL until Ms. Gonzalez could locate the welder with whom Ms. Gary would be working. *See* Cordero Aff. at ¶ 32.

44. At some point, without being directed to, and contrary to the instructions she had received, Ms. Gary ascended to a different level of USS McFAUL where the turbine plenum blow-in doors were located. *See* Cordero Aff. at ¶ 33.

45. For an unknown reason, Ms. Gary stuck her upper torso inside the open blow-in doors. At some point, after positioning her upper body inside the blow-in doors, the doors shut on Ms. Gary, crushing her. *See* Cordero Aff. at ¶ 33.

46. Ms. Gary died as a result of injuries. Compl. ¶ 28.

47. Blue provided death benefits to Ms. Gary's Estate under the LHWCA. *See* Cordero Aff. at ¶ 35.

## **LEGAL STANDARD**

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing such a motion, courts review the record as a whole and view the evidence in the light most favorable to the non-moving party. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S.

317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Terry's Floor Fashions v. Burlington Indus.*, 763 F.2d 604, 610 (4th Cir. 1985). "'[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Princess Cruises, Inc. v. General Elec. Co.*, 950 F.Supp. 151, 154 (E.D. Va. 1996) (quoting *Celotex*, 477 U.S. at 322). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and . . . it should be interpreted in a way that allows it to accomplish that purpose." *Celotex*, 477 U.S. at 323-24.

## ARGUMENT

By any legal standard, Ms. Gary was a Harbor employee. Ms. Gary was either a borrowed employee of Harbor or a joint employee of both Blue and Harbor. Either way, Harbor undoubtedly was Ms. Gary's employer under the LHWCA. Accordingly, the LHWCA provides the Plaintiff its exclusive remedy for any work-related death claim against Harbor. Because of that, the Plaintiff's tort claims pled against Harbor in this action necessarily must fail, as a matter of law.

**I.  The Plaintiff is precluded, as a matter of law, from pursuing a tort claim against Harbor, as Ms. Gary's borrowing employer.**

Ms. Gary was a borrowed employee of Harbor under the LHWCA. As a borrowing employer, Harbor is immunized from the tort claims asserted by the Plaintiff, and the LHWCA affords the Plaintiff its sole remedy against Harbor. Federal law on this issue is well-settled, and the Plaintiff has no basis to disrupt this well-established precedent by suing Harbor, Ms. Gary's borrowing employer.

The LHWCA is a "no-fault federal compensation scheme designed to give protection to injured maritime workers while at the same time affording employers some degree of predictability

with regard to those workers' recoveries." *White v. Bethlehem Steel Corp.*, 222 F.3d 146, 148 (4th Cir. 2000) (internal citations omitted). Under the LHWCA, an employer's liability is limited to workers' compensation benefits under the Act; covered employees cannot bring a personal injury action against their employer. *See* 33 U.S.C. § 905(a); *White*, 222 F.3d at 148. Such liability is exclusive and extends to fellow servants.

An employer under 33 U.S.C. § 905(a) "encompasses both general employers and employers who 'borrow' a servant from that general employer." *White*, 222 F.3d at 149; *see Huff v. Marine Tank Testing Corp.*, 631 F.2d 1140, 1143 (4th Cir. 1980). Under this "borrowed servant" or "borrowed employee" doctrine, a worker can be in "the general employ of one company while at the same time being in the particular employ of another 'with all of the legal consequences of the new relation.'" *White*, 222 F.3d at 149 (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 220 (1909)). The Fourth Circuit has adopted "the authoritative direction and control test" to determine whether an employee is a borrowed servant. *Id.* at 149-150. Under this test, courts "'must inquire whose is the work being performed . . . by ascertaining who has the power to control and direct the servants in the performance of their work.'" *Id.* at 149 (quoting *Standard Oil*, 212 U.S. at 221-22.). Notably, "[t]he authority of the borrowing employer does not have to extend to every incident of an employer-employee relationship; rather, it need only encompass the servant's performance of the particular work in which he is engaged at the time of the accident." *Id.* (citing *Standard Oil*, 212 U.S. at 220; *McCollum v. Smith*, 339 F.2d 348, 351 (9th Cir. 1964)).

The question of borrowed servant or borrowed employee status generally is a matter of law. *See Gaudet v. Exxon Corp.*, 562 F.2d 351, 357 (5th Cir. 1977). Under the Fourth Circuit's authoritative direction and control test, a court may look at a variety of factors to inform whether an employee is a borrowed servant. *See White*, 222 at 149. Those factors include, "the supervision

of the employee, the ability to unilaterally reject the services of an employee, the payment of wages and benefits either directly or by pass-through, or the duration of employment." *Id.* However, it should be noted that "any particular factor only informs the primary inquiry—whether the borrowing employer has authoritative direction and control over a worker." *Id.* Importantly, "[w]hen the borrowing employer possesses this authoritative direction and control over a particular act, it in effect becomes the employer. In that situation, the *only remedy* of the employee is through the LHWCA." *Id.* (emphasis added).

In *White,* the Fourth Circuit noted that the fact that the plaintiff had brought suit against Bethlehem Steel was evidence of Bethlehem Steel's control over him. *See id.* at 150. Such a negligence suit "presume[d] that Bethlehem Steel had a duty in the first place." *Id.* Similarly, here, the Plaintiff sues Harbor for negligence, maintaining, *inter alia*, that Harbor owed Ms. Gary a duty of reasonable care as well as a duty to furnish her with a safe work area. *See* Compl., ¶ 47. Harbor would, therefore, owe Ms. Gary those duties by virtue of it employing her.

In this case, there is no question that Harbor exercised the requisite "authoritative direction and control" over Ms. Gary. *See* Statement of Undisputed Facts ¶¶ 17-21, 26-27, 30-31, 39-40, and 42. Ms. Gary's supervisors at Harbor were either Harbor employees or Blue employees appointed by Harbor to serve as her supervisors. *See* Statement of Undisputed Facts ¶¶ 34-43. Ms. Gary received her work assignments and was instructed in her day-to-day activities by her supervisor employed by Harbor. *See* Statement of Undisputed Facts ¶¶ 30 and 39. In addition, the contract between Harbor and Blue makes it clear that Harbor "is responsible for assigning, directing, and controlling the work" of temporary employees such as Ms. Gary. *See* **Exhibit 3**, at p. 3. At least one decision following *White* in the Fourth Circuit indicates facts similar to the foregoing are more than sufficient to establish authoritative direction and control. *See Ladd v.*

*Research Triangle Inst.*, 335 Fed. Appx. 285, 288 (4th Cir. 2009) (affirming the district court's finding that a contractor who, in relevant part, reported directly to the defendant, could be fired or assigned by the defendant, and was following the instructions and orders of the defendant in the performance of his work was a borrowed employee).

Furthermore, Harbor could reject the services of a Blue contract employee. *See* Statement of Undisputed Facts ¶¶ 26-27. Harbor had the authority to terminate the assignment of any temporary employee provided to it by Blue and had the power to direct that employee to leave the job site and not report back to it. *See* Statement of Undisputed Facts ¶¶ 26-27. The Agreement between Blue and Harbor also established that Ms. Gary's wages and benefits effectively were to be paid by Harbor to Blue, and then, through Blue, to Ms. Gary. *See* Statement of Undisputed Facts ¶¶ 10-11. Ms. Gary was assigned to work for Harbor—and only for Harbor—at NASSCO-Norfolk's shipyard for an indefinite period. *See* Statement of Undisputed Facts ¶ 15. And, Ms. Gary worked for Harbor—and only for Harbor—off and on for three weeks in February and March of 2021. *See* Statement of Undisputed Facts ¶ 19. Each day Ms. Gary worked, she reported to her Harbor supervisor in the morning, in Harbor's trailer at NASSCO-Norfolk. *See* Statement of Undisputed Facts ¶ 30. Ms. Gary attended a daily toolbox safety training in that same Harbor trailer, received her assignment from her Harbor supervisor, and worked under the direction and control of her Harbor, and/or Harbor-appointed, supervisors, each day. *See* Statement of Undisputed Facts ¶¶ 30, 34-39, and 42.

Taking all four factors together, there is ample evidence for this Court to find that Harbor exercised the requisite authoritative direction and control over Ms. Gary. Indeed, it is quite clear, as a matter of law, that Ms. Gary was Harbor's borrowed employee. Consequently, also as a matter of law, Harbor cannot be liable in tort to the Plaintiff because the tort immunity provided to

11

employers under the LHWCA clearly attaches to Harbor.  *See* 33 U.S.C. §§ 905(a) and 933(i) ("The right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured . . . by the negligence or wrong of any other person or persons in the same employ.").

> II. **The Plaintiff also is precluded, as a matter of law, from pursuing a tort claim against Harbor, as Ms. Gary's joint employer.**

Ms. Gary was employed jointly by Harbor and Blue.  While there is no reported case the undersigned could find analyzing joint employment under the LHWCA,[3] it is clear that, when looking at the tests the Fourth Circuit has applied in determining joint employment status in Title VII cases (*see Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404 (4th Cir. 2015)) and Fair Labor Standards Act (hereinafter, "FLSA") cases (*see Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125 (4th Cir. 2017)), Ms. Gary quite clearly was a joint employee of Blue and Harbor, and that Harbor was a joint employer of Ms. Gary.  The same also is true if one applies either of the two principal joint employment tests used by the National Labor Relations Board as well (*compare Browning-Ferris Industries of California, Inc. v. NLRB*, 911 F.3d 1195, 1222 (D.C. Cir. 2018, and *Hy-Brand Industrial Contractors, Ltd. et, al*, 365 N.L.R.B. No. 156, 35 (Dec. 14, 2017)).

In *Butler*, the Fourth Circuit officially adopted, as the law of this Circuit, the "hybrid test" for determining joint employment under Title VII.  793 F.3d at 413.  In reaching that conclusion, the court in *Butler* explained that the hybrid test "best captures the reality of modern employment in which 'control' of an employee may be shared by two or more entities."  *Id.* at 414.  Under the hybrid test, the "principal guidepost" of the analysis is "the common-law element of control", but

---

[3] Almost certainly because the analysis automatically reverts to one under the analogous "borrowed servant doctrine" more familiar to workers compensation jurisprudence.  *See supra* Section I.

courts are encouraged to consider the following nine factors when assessing whether an individual is jointly employed:

> (1) authority to hire and fire the individual;
> (2) day-to-day supervision of the individual, including employee discipline;
> (3) whether the putative employer furnishes the equipment used and the place of work;
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
> (5) the length of time during which the individual has worked for the putative employer;
> (6) whether the putative employer provides the individual with formal or informal training;
> (7) whether the individual's duties are akin to a regular employee's duties;
> (8) whether the individual is assigned solely to the putative employer; and
> (9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* In *Butler*, the Fourth Circuit held "as a matter of law" that a joint employment relationship existed between a temporary staffing agency and its customer. *Id.* at 415. The plaintiff was hired by ResourceMFG, a temporary staffing agency, to work for Drive Automotive Industries. *Id.* at 406. During the plaintiff's time working for Drive, she alleged that one of her Drive supervisors verbally and physically harassed her. *Id.* at 407. Ultimately, Drive requested that the plaintiff be terminated, and a few days later a ResourceMFG supervisor called and terminated the plaintiff. *Id.* After evaluating the nine factors recited above, the court determined that four of the nine factors leaned in favor of a finding of joint employment. *See id*. at 415. Ultimately the court found that "although ResourceMFG disbursed [the plaintiff's] paychecks, officially terminated her, and handled employee discipline, it did not prevent Drive from having *a substantial degree of control* over the circumstances of [the plaintiff's] employment." *Id.* (emphasis added). Thus, Drive—like Harbor here—was the plaintiff's joint employer for Title VII purposes.

At least six of the nine factors enumerated in *Butler* lean in favor of finding that a joint employment relationship existed between Blue and Harbor. Harbor had the authority to request a Blue temporary employee be terminated or reassigned. *See* Statement of Undisputed Facts ¶¶ 26-27. Harbor also exercised day-to-day supervision of Blue temporary employees assigned to work

on Harbor's projects. *See* Statement of Undisputed Facts ¶¶ 30, 34-42. If Blue employees were unable to work on any given day, they were required to notify their Harbor point of contact (and were merely encouraged to notify their Blue point of contact). *See* Statement of Undisputed Facts ¶¶ 21-22. Harbor set the daily and weekly schedules that Blue employees were expected to work. *See* Statement of Undisputed Facts ¶ 17. Harbor furnished the equipment that Blue's temporary employees used and supplied them with their place of work. *See* Statement of Undisputed Facts ¶ 31. Harbor provided safety toolbox talks/training for all Harbor and Blue employees during Harbor's morning briefing in the Harbor trailer at NASSCO-NORFOLK. *See* Statement of Undisputed Facts ¶ 30. Blue's temporary employees worked solely for Harbor performing work that Harbor was subcontracted to perform for CMS aboard USS McFAUL. *See* Statement of Undisputed Facts ¶ 28.

Moreover, the facts surrounding the employment relationship in this case are nearly identical to those in *Butler*. As in *Butler*, Ms. Gary was hired by a staffing company (Blue) to work for a customer (Harbor). *See* Statement of Undisputed Facts ¶¶ 14-15. Similarly, just as ResourceMFG did in *Butler*, Blue maintained Ms. Gary's employment records and disbursed her paychecks. *See* Statement of Undisputed Facts ¶¶ 23-24. Harbor, just like Drive, in *Butler*, exercised *a substantial degree of control* over the employment of all temporary employees assigned by Blue to Harbor, including Ms. Gary. *See* Statement of Undisputed Facts ¶¶ 17-21, 26-27, 30-31, 39-40, and 42. For all practical and legal purposes, Ms. Gary had two employers . . . and Harbor most definitely was one of them.

In *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298 (4th Cir. 2006), the Fourth Circuit adopted the "not completely disassociated" or "entirely independent" test in determining whether a joint employment relationship exists under the FLSA. The court in *Schultz* further explained that

inquiry must address the "relationship between the employer who uses and benefits from the services of workers and the party that hires or assigns the workers to that employer." *Id.* at 306. Then, in *Salinas*, the Fourth Circuit reaffirmed its decision in *Schultz* and set forth a variety of factors for courts to consider when determining whether two persons or entities are joint employers. 848 F.3d at 140. In *Salinas*, the court made clear that the joint employer inquiry "requires courts to determine whether the putative joint employers are not wholly disassociated or, put differently, share or codetermine the essential terms and conditions of a worker's employment." *Id.* at 139. Courts should consider six non-dispositive and non-exhaustive factors when answering this question:

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;
> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;
> (3) The degree of permanency and duration of the relationship between the putative joint employers;
> (4) Whether through shared management or a direct or indirect ownership interest, one putative employer controls, is controlled by, or is under common control with the other putative employer;
> (5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and
> (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance, paying payroll taxes, or providing facilities, equipment, tools, or materials necessary to complete the work.

*Id.* at 141-142. However, at the end of the day, "the fundamental threshold question that must be resolved in every joint employment case [is] whether a purported joint employer shares or codetermines the essential terms and conditions of a worker's employment. . . ." *Id.* at 142.

In *Salinas*, the plaintiffs were hired by J.I. General Contractors, Inc. and assigned to work almost exclusively for Commercial Interiors, Inc. 843 F.3d at 129. "Nearly all of J.I.'s work came

15

through its contracts with Commercial." *Id.* at 130. "J.I. was generally responsible for hiring and firing [the p]laintiffs. . . " *Id.* "Typically, J.I. paid [the p]laintiffs." *Id.* "Commercial . . . played a role in determining [the p]laintiffs' daily and weekly schedules", "decided upon the start and end times for work on the jobsite", and "told certain [p]lainitffs to work additional hours or to report to work on Sundays." *Id.* "Commercial also was involved in determining whether [the p]laintiffs worked each day" and "Commercial's superintendent regularly communicated Commercials' site-specific staffing needs" to which J.I. employees were assigned per Commercial's requests. *Id.* "Upon reporting to the assigned jobsite each day, Commercial required [the p]laintiffs to sign in on timesheets provided by Commercial and bearing Commercial's logo." *Id.* Finally, "[a]fter signing in for work on nearly every morning, Commercial required [the p]laintiffs to attend meetings . . . regarding the projects [the p]laintiffs needed to complete and the methods they needed to follow in doing so." *Id.* at 130-31. After evaluating the six factors the court concluded that since Commercial and J.I. *shared or co-determined* the essential terms and conditions of the plaintiffs' employment, Commercial and J.I. were the plaintiffs' joint employers. *Id.* at 145.

All six factors enumerated in *Salinas* indicate the existence of a joint employment relationship between Blue and Harbor. Factors (1) and (6) are satisfied by the Agreement between Blue and Harbor wherein Blue and Harbor jointly determine, share, or allocate (a) the power to direct, control, or supervise the employee to Harbor, *see* **Exhibit 3**, and (b) the responsibilities of handling payroll, workers' compensation insurance, paying payroll taxes, and furnishing equipment and tools between Blue and Harbor. *See* **Exhibit 3** and Statement of Undisputed Facts ¶¶ 10-11 and 31. Factor (2) is satisfied because, although Blue *technically* had the official responsibility of terminating temporary employees hired to work for Harbor, Harbor could terminate, relieve, or request the termination or release, of any employee assigned by Blue to

Harbor.  *See* Statement of Undisputed Facts ¶¶ 25-27.  Factor (3) is satisfied because the majority, if not all of Blue's work came through its contracts with Harbor.  *See* Statement of Undisputed Facts ¶ 6.  Factor (4) is satisfied given that 50% of Blue is owned by Rolando Fajardo, the sole owner of Harbor.  *See* Statement of Undisputed Facts ¶ 4.  Finally, factor (5) is satisfied because all work Blue temporary employees were performing aboard USS McFAUL was work awarded to Harbor under its subcontract agreement with CMS.  *See* Statement of Undisputed Facts ¶ 28.  Blue had no independent basis to perform any work aboard USS McFAUL, and therefore, by default, Harbor provided the Blue employees assigned to it the premises where their work was to be performed.  *See* Statement of Undisputed Facts ¶¶ 18 and 30.  It is clear that Blue and Harbor are not "completely disassociated" or "entirely independent" from each other and both *share or codetermine* the essential terms and conditions relating to the employment of employees, like Ms. Gary.

Finally, even under the current standard adopted by the National Labor Relations Board ("NLRB") for determining joint-employer status under the National Labor Relations Act ("NLRA"), Ms. Gary would be a joint employee of Blue and Harbor.  The NLRB released a Notice of Proposed Rulemaking in September 2022, adopting the test enumerated in *Browning-Ferris* as the standard for determining joint-employer status.  *See* N.L.R.B., Office of Public Affairs, *NLRB Issues Notice of Proposed Rulemaking on Joint-Employer Standard*, (Sept. 6, 2022) https://www.nlrb.gov/news-outreach/news-story/nlrb-issues-notice-of-proposed-rulemaking-on-joint-employer-standard.

Under *Browning-Ferris*, two or more employers will be considered joint employers if they "'share or codetermine those matters governing employees' essential terms and conditions of employment.'"  911 F.3d at 1205 (quoting *Browning-Ferris Indus. Of Cal., Inc.*, 362 N.L.R.B. No.

186, at 2 (Aug. 27, 2015)). In February 2020, the NLRB issued a final rule and provided an "exhaustive list" of essential terms and conditions of employment including "wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction." Joint Employer Status Under the National Labor Relations Act, 85 Fed. Reg. 11184, 11184 (Feb. 26, 2020). For the reasons described in greater detail herein, Blue and Harbor would fall squarely within the joint-employer status under the NLRB's current standard because the two employers clearly shared or codetermined the essential terms and conditions of Ms. Gary's employment.

Tellingly, the same result would be reached if Harbor's relationship to Ms. Gary was analyzed under the *Hy-Brand* joint employment test used by the NLRB in recent years. Under the *Hy-Brand* approach, "a finding of joint employment status" required the satisfaction of three factors: (1) "proof that the alleged joint employer entities have actually exercised joint control over essential employment terms (rather than merely having 'reserved' the right to exercise control)," (2) the control exercised was "direct and immediate," and (3) the control exercised was not "limited and routine." *Hy-Brand*, 365 N.L.R.B. No. 156, 35. For the reasons set forth in the factual recitations, *supra*, Harbor plainly was Ms. Gary's joint employer under the *Hy-Brand* test.

## CONCLUSION

Regardless of whether this Court applies the borrowed servant/employee doctrine or determines that Harbor was Ms. Gary's joint employer, her estate is barred as a matter of law from pursuing any work-related injury or death claim against Harbor. The Plaintiff's sole remedy against Harbor is provided by the LHWCA. As Ms. Gary's borrowing or joint employer, Harbor is absolutely immune from suit for Ms. Gary's death aboard USS McFAUL in March of 2021. Her estate has already received the LHWCA benefits to which it is entitled. Accordingly, that same estate is legally precluded from suing Harbor for any of its claims in this case.

18

WHEREFORE, Defendant Harbor Industrial Services, Inc. respectfully requests that the Court grant its Motion for Summary Judgment, enter an order dismissing as much of the Plaintiff's suit as is pled against Harbor Industrial Services, Inc. with prejudice, and award to the Defendant such other and further relief as this Court may deem just and proper.

Dated: June 30, 2023

HARBOR INDUSTRIAL SERVICES, INC.,

By: */s/ Heather R. Pearson*
Christopher A. Abel
(VSB No. 31821)
Heather R. Pearson
(VSB No. 97157)
Willcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
Telephone: 757.628.5500
Facsimile: 757.628.5566
cabel@wilsav.com
hpearson@wilsav.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of June 2023, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all known counsel of record.

                                                */s/ Heather R. Pearson*
Christopher A. Abel
(VSB No. 31821)
Heather R. Pearson
(VSB No. 97157)
Willcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
Telephone:  757.628.5500
Facsimile:   757.628.5566
cabel@wilsav.com
hpearson@wilsav.com

I-2612148.1