# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE EASTERN DISTRICT OF VIRGINIA
 3                        NORFOLK DIVISION
 4
       --------------------------  )
 5                                 )
       DOUGLAS I. HORNSBY,         )
 6     Administrator of the        )
       Estate of CYNTHIA GARY,     )
 7                                 )
             Plaintiff,            ) CASE NO. 2:22-cv-427
 8                                 )
       vs.                         )
 9                                 )
       UNITED STATES OF AMERICA,   )
10     et al.,                     )
                                   )
11           Defendants.           )
       --------------------------  )
12
13       VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION
14                       OF KELVIN BUIE
15              TAKEN ON BEHALF OF THE DEFENDANTS
16                     Norfolk, Virginia
17                Thursday, October 24, 2024
18                       10:00 a.m. EST
19
20
21
22
23
24     Reported By:  Bobbi J. Case, RPR, CCR
25     Job No. CS6974705
```

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF VIRGINIA
 3                      NORFOLK DIVISION
 4

       ---------------------------    )
 5                                    )
       DOUGLAS I. HORNSBY,            )
 6     Administrator of the           )
       Estate of CYNTHIA GARY,        )
 7                                    )
              Plaintiff,              ) CASE NO. 2:22-cv-427
 8                                    )
       vs.                            )
 9                                    )
       UNITED STATES OF AMERICA,      )
10     et al.,                        )
                                      )
11          Defendants.               )
       ---------------------------    )
12
13      VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION
14                      OF KELVIN BUIE
15            TAKEN ON BEHALF OF THE DEFENDANTS
16                    Norfolk, Virginia
17               Thursday, October 24, 2024
18                     10:00 a.m. EST
19
20
21
22
23
24     Reported By:  Bobbi J. Case, RPR, CCR
25     Job No. CS6974705
```

```
 1     Appearances:
 2              RULOFF, SWAIN, HADDAD, MORECOCK
 3              TALBERT & WOODWARD, P.C.
 4              317-30th Street
 5              Virginia Beach, VA  23451
 6              (757) 671-6012
 7          By: ANDREW M. HENDRICK, ESQUIRE
 8                 ahendrick@srgslaw.com
 9                 Counsel for the Plaintiff
10
11              UNITED STATES DEPARTMENT OF JUSTICE
12              Civil Division, Torts Branch
13              175 N Street, NE, 11th Floor
14              Washington, DC  20002
15              (202) 307-0033
16          By: MALINDA R. LAWRENCE, ESQUIRE
17                 malinda.r.lawrence@usdoj.gov
18                 SHAUN M. PEHL, ESQUIRE
19                 shaun.pehl@usdoj.gov
20                 JAMES R. WHITMAN, ESQUIRE
21                 james.whitman@usdoj.gov
22                 (Via videoconference)
23                 JOSEPH MANTZ, ESQUIRE
24                 (Via videoconference)
25                 Counsel for the United States
```

1    Appearances (Continued):

2

3         WOODS ROGERS VANDEVENTER BLACK, PLC

4         101 West Main Street, Suite 500

5         Norfolk, VA  23510

6         (757) 446-8600

7         By:  JENNIFER L. EATON, ESQUIRE

8              jennifer.eaton@wrvblaw.com

9              KATE LENNON ELLIS, ESQUIRE

10             kate.lennon@woodsrogers.com

11             Counsel for Defendant

12             Advanced Integrated Technologies, LLC

13

14        WILLIAMS MULLEN

15        200 South 10th Street, Suite 1600

16        Richmond, VA  23219

17        (804) 420-6461

18        By:  LYNN K. BRUGH, IV, ESQUIRE

19             lbrugh@williamsmullen.com

20             Counsel for Defendant

21             Metro Machine Corp.,

22             d/b/a General Dynamics NASSCO-Norfolk

23

24

25

```
 1                    I N D E X
 2    DEPONENT                                       PAGE
 3    KELVIN BUIE
 4        DIRECT EXAMINATION
 5              By Ms. Lawrence                         9
 6        CROSS-EXAMINATION
 7              By Mr. Hendrick                       188
 8        CROSS-EXAMINATION
 9              By Mr. Brugh                          194
10        CROSS-EXAMINATION
11              By Ms. Eaton                          214
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    BY MS. LAWRENCE:
 2            Q.   Okay.  So if we look back again at
 3    the first procedure, we read the "Test blow-in
 4    doors' automatic operation," et cetera, et cetera.
 5    Those -- those steps in Section b where it says,
 6    "Isolate low-pressure (LP) air to blow-in panel
 7    solenoids and attach safety tags in accordance
 8    with the TUM and/or local tag-out instruction,"
 9    and 2, "De-energize power to moisture
10    separator/blow-in panel heater strip," would you
11    agree that those steps don't appear in this
12    procedure that we've just read?
13                 MS. EATON:  Object to the form.
14                 THE DEPONENT:  That's correct.
15
16    BY MS. LAWRENCE:
17            Q.   Okay.  Now, with regard to this
18    procedure for replacing the blow-in door gasket,
19    when you undertook the blow-in door gasket
20    replacement project on the McFAUL maintenance
21    availability, did you review or use this procedure
22    in any way?
23                 MS. EATON:  Object to the form.
24                 THE DEPONENT:  This procedure's not
25    presented to contractors, so we have no knowledge
```

1            Once you tag it back out, we're
2      inspecting to see if something got stuck in the
3      gasket, some old paint that was up there fell in
4      the gasket.  See if there was any defects in the
5      gasket.
6
7      BY MS. LAWRENCE:
8            Q.   Okay.  All right.  You talked about
9      the gasket replacement product on the McFAUL
10     maintenance availability and you talked about a
11     WAF or a Work Authorization Form.  Is that
12     correct?
13           A.   Yes, ma'am.
14           Q.   Okay.  Can you describe the work
15     authorization process on the McFAUL maintenance
16     availability?
17           A.   Me, as the contractor, check the work
18     item, see what's the description of what are we
19     doing, and then I take the WAF authorization form
20     and -- I forget what block it is.  I think it's
21     Block 11 maybe -- write the description in, what
22     we're doing, and turn it over to -- let them know
23     it needs to be tagged out and what position we
24     need it to be in.
25                Turn it over to the WAF coordinator,

1    and then the WAF coordinator will get with the
2    ship and say, "Hey, this is what the contractor
3    wants." Want the door tagged out in an open
4    position so they can replace the gasket -- or
5    whatever the description is.
6                    For this, replace the gasket.
7                    And then at that point, the ship will
8    -- supposed to look at the drawings and build the
9    tag-out.
10                   Once they build the tag-out in eSOMS,
11   they will let the contractor know -- they'll let
12   the WAF coordinator know. The WAF coordinator
13   will call the contractor and be like, "Hey, WAF is
14   ready for you to come back up here and RA."
15                   That form will go back up there and
16   verify that -- what the ship is tagging out is --
17   verifying that if they're saying "needs tagged
18   out," some valve needs to be tagged out to isolate
19   the system, that's what we're going back to
20   verify.
21                   Once I go in the system, I look to
22   see in my description there, and if it's correct,
23   then I will put my password in to -- for the RA to
24   RA that section. And then the ship, if they're
25   ready at that point, they would turn it over to

1    the authorizing officer.  They would issue the
2    tags to the Navy guy -- to -- they will issue tags
3    to the Navy sailors, then they would do it.
4              The first checker go hang the tags.
5    Then when the first checker comes back, he gives
6    it to the second checker.  The RA will go with the
7    second checker to verify the tags after the second
8    checker signs it to make sure that everything is
9    tagged out on what they're -- with the tag out.
10             Then initial the line item sheet of
11   what's there, what we verified.
12             It will go back to the authorizing
13   officer, and the authorizing officer will look at
14   the tag to make sure everybody's initials is on
15   there, and then he will issue -- he will hang the
16   tag in the system.
17             Then at that point, he will sign the
18   WAF and give it to me.  I will sign the WAF, then
19   we give it to the WAF coordinator.  The WAF
20   coordinator will sign the WAF.
21             Then once the WAF coordinator signs
22   the WAF, then he will make copies and give it to
23   me, and I will be good to go for it.
24        Q.   Okay.  Got it.
25             All right.  I want to show you some

1   officer, "Hey, the tags are ready to be hung."
2            Q.   So correct me if I'm wrong, but it
3   sounds like, then, the NASSCO-Norfolk's WAF
4   coordinator's role is simply taking the
5   contractor's WAF request to ship's crew and then
6   coming back and notifying that contractor's RA,
7   that, yeah, they've built it out and it's time for
8   you to go?
9            A.   Yes.
10                MS. EATON:  Objection to form.
11                THE DEPONENT:  They pretty much just
12  track the process of the WAF.  That's pretty much
13  -- once it's -- once we submit it, they put it on
14  a log.
15                And in terms of ship -- once the ship
16  is ready, once we hang it, then they'll update the
17  status on their log, and once we're ready to clear
18  it, then we'll clear it and take it off the log.
19
20  BY MR. BRUGH:
21           Q.   Is it fair to say that the WAF
22  coordinator's role is pretty much administrative?
23                MS. EATON:  Object to the form.
24                THE DEPONENT:  Yes.
25

1                    Team lead?
2           A.    Yes.
3           Q.    -- are you the one that then
4    determines, okay, we've got to replace these
5    gaskets, I determine how that's going to be done
6    in terms of what my men have to do?
7           A.    Yes.
8                 MS. EATON:  Object to the form.
9                 THE DEPONENT:  Yes.
10                I look at, like I said, whatever
11   reference they give, drawings and stuff.  Once it
12   gets tagged out, then I can go in the space and
13   kind of look and see the easiest way to remove it.
14
15   BY MR. BRUGH:
16          Q.    And we've already discussed it, you
17   don't know what's needed to tag-out the blow-in
18   doors.  That's up to the Navy.  But in terms of
19   actually replacing the gaskets, you put together
20   the plan or determine exactly how that will be
21   done.  Correct?
22          A.    Yes.
23                MS. EATON:  Objection to form.
24                THE DEPONENT:  Yes.
25

```
 1    BY MR. BRUGH:
 2          Q.   And you are the one that directs your
 3    crew on how to do it or if they're doing it wrong
 4    or if they need to do something differently.
 5    Correct?
 6                MS. EATON:  Object to form.
 7                THE DEPONENT:  Yes.
 8
 9    BY MR. BRUGH:
10          Q.   And there's no, like,
11    NASSCO-Norfolk -- there's no NASSCO-Norfolk
12    employer that's there telling them what to do.
13    You're the one doing it.  Correct?
14                MS. EATON:  Objection to form.
15                THE DEPONENT:  That's correct.
16
17    BY MR. BRUGH:
18          Q.   And I think you also testified that
19    AIT orders the parts for replacing the gaskets?
20          A.   Yes, because it wasn't considered, as
21    I say, GFM, which would have been listed on the
22    back.
23                So it's basically saying the
24    government will provide.
25          Q.   Okay.  But in this case --
```

1　　　　　　A.　The government did not provide, so
2　　they paid us to procure the material ourselves.
3　　　　　　Q.　Okay.  And when the work is to be
4　　done -- I know it's based on priority, you talked
5　　about that, and -- but once the tag-out process
6　　has been completed and that's all done, then you
7　　get to determine -- and you're told, okay, you can
8　　go ahead and do the work now, you actually
9　　determine what day that you do it.
10　　　　　　　　　MS. EATON:  Object to the form.
11
12　　BY MR. BRUGH:
13　　　　　　Q.　Correct?
14　　　　　　A.　Yes.
15　　　　　　Q.　And do you-all use your own tools in
16　　replacing those gaskets?
17　　　　　　A.　Yes.
18　　　　　　Q.　And so you've got -- AIT's got
19　　control, or you've got control, over your crew as
20　　to how that replacement of the gaskets takes
21　　place?
22　　　　　　A.　Yes.
23　　　　　　　　　MS. EATON:  Object to the form.
24　　　　　　　　　THE DEPONENT:  Based off references
25　　that we use.

```
 1      BY MR. BRUGH:
 2              Q.   These might sound like silly
 3      questions, but I need to ask them anyway.
 4                   The people that -- the crew that is
 5      used to do this replacement, the gasket work,
 6      that's determined by AIT.  Correct?
 7                   MS. EATON:  Object to the form.
 8                   THE DEPONENT:  Yes.
 9
10      BY MR. BRUGH:
11              Q.   NASSCO-Norfolk doesn't have any role
12      in deciding who's a part of that crew?
13              A.   Yes.  That's correct.
14              Q.   That's correct.  Okay.
15                   And that crew and all associated with
16      AIT, they get paid by AIT.  Correct?
17              A.   Yes.
18              Q.   And if anybody on that crew is to be
19      fired or hired, that's determined by AIT.
20      Correct?
21                   MS. EATON:  Object to the form.
22                   THE DEPONENT:  That's correct.
23                   MR. BRUGH:  Mr. Buie, those are all
24      the questions I have.  Thanks.
25                   THE DEPONENT:  All right.
```