# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

DOUGLAS I. HORNSBY, Administrator )
of the Estate of CYNTHIA GARY, )
)
    Plaintiff, )
)
-vs- )
)
UNITED STATES OF AMERICA, )   CASE NO.:
)
    Defendant/Third-Party Plaintiff, )   2:22cv427
)
and )
)
METRO MACHINE CORP., d/b/a )
GENERAL DYNAMICS NASSCO - Norfolk, )
)
and )
)
ADVANCED INTEGRATED TECHNOLOGIES, LLC, )
)
    Third-Party Defendants. )

DEPOSITION UPON ORAL EXAMINATION OF

GSMC ANITA PREETAM

TAKEN ON BEHALF OF THE PLAINTIFF

NORFOLK, VIRGINIA

SEPTEMBER 24, 2024, 8:36 A.M.

Reported by: Suzanne M. Myers, RMR

A P P E A R A N C E S

COUNSEL FOR THE PLAINTIFF:

    Mr. Andrew M. Hendrick, Esquire
    RULOFF, SWAIN, HADDAD, MORECOCK,
      TALBERT & WOODWARD, P.C.
    317 30th Street
    Virginia Beach, VA 23451
    757-671-6000
    ahendrick@srgslaw.com


COUNSEL FOR THE UNITED STATES DEPARTMENT OF JUSTICE:

    Ms. Malinda R. Lawrence, Esquire
    UNITED STATES DEPARTMENT OF JUSTICE
    CIVIL DIVISION, TORTS BRANCH
    Aviation, Space & Admiralty Litigation
    175 N Street, NE, 8th Floor
    Washington, DC 20002
    202-598-5779
    Malinda.R.Lawrence@usdoj.gov

and

    Mr. Shaun Pehl, Esquire
    UNITED STATES DEPARTMENT OF JUSTICE
    CIVIL DIVISION, TORTS BRANCH
    Aviation, Space & Admiralty Litigation
    175 N Street, NE, 8th Floor
    Washington, DC 20002
    202-616-4035
    shaun.pehl@usdoj.gov

```
 1                    APPEARANCES (Cont'd.)
 2
 3
 4   COUNSEL FOR ADVANCED INTEGRATED TECHNOLOGIES, LLC:
 5         Ms. Jennifer L. Eaton, Esquire
           WOODS ROGERS VANDEVENTER BLACK PLC
 6         101 West Main Street, Suite 500
           Norfolk, VA 23510
 7         757-446-8538
           Jennifer.Eaton@wrvblaw.com
 8
 9
10   COUNSEL FOR NASSCO:
11         Mr. Lynn K. Brugh, IV, Esquire
           WILLIAMS MULLEN
12         200 South 10th Street, Suite 1600
           Richmond, VA 23219
13         lbrugh@williamsmullen.com
14
15
16
17
18
19
20   Also Present:   Joseph Mantz
21                   David Rudolph
22
23
24
25
```

```
 1           Deposition upon oral examination of
 2   GSMC ANITA PREETAM, taken by and before Suzanne M. Myers,
 3   RMR, a Notary Public for the State of Virginia at Large,
 4   commencing on September 24th, 2024, at 8:36 a.m., at the
 5   offices of the United States Attorney, 101 West Main Street,
 6   Suite 8000, Norfolk, Virginia, to be used as evidence in the
 7   above-styled cause.
 8
 9                      * * * * * * * * * *
10                              I N D E X
11
12                              WITNESS
13
     ALL WITNESSES:                                          PAGE:
14
     FOR THE PLAINTIFF:
15
16     GSMC ANITA PREETAM:
17       EXAMINATION BY MR. HENDRICK                           7:7
         EXAMINATION BY MS. EATON                             51:11
18       EXAMINATION BY MR. BRUGH                              69:7
         EXAMINATION BY MR. HENDRICK                         137:18
19       EXAMINATION BY MS. LAWRENCE                         145:16
         EXAMINATION BY MR. BRUGH                            171:24
20       EXAMINATION BY MS. EATON                            177:17
         EXAMINATION BY MR. HENDRICK                         182:18
21
22
23
24
25
```

1  head, the one that comes to mind would be the R1.  It's
2  where you wash down the blow-in doors.
3              That check is 72 hours after entering port.
4       Q.    What do you do to tag out the doors in the closed
5  position?
6       A.    I couldn't tell you off the top of my head, sir.
7       Q.    Have you ever done a tag-out for the closed
8  position?
9       A.    I'm sure I have.
10      Q.    But you can't recall what specifics you do?
11      A.    I would have to look at the tags -- look at the
12 PMS card.
13      Q.    Okay.  Was this time -- this incident on the
14 MCFAUL in 2021, was that the only time you had been asked to
15 tag out the doors in the open position?
16      A.    To my recollection, yes.
17      Q.    Okay.  I want to look at the next sentence.
18             It says:  GSM1 Preetam stated that, quote, she
19 owned those doors, end quote, meaning it was her duties to
20 control them, and she decided it was best to leave the air
21 pressure on the system so the pneumatics would hold the door
22 in the open position while work by contractors was being
23 conducted.
24             Do you recall making a statement to someone that
25 you, quote, owned the doors?

1  authorizing officer?
2       A.   Yes.
3       Q.   And then, in parentheses, it says "Hung."
4            What does that "Hung" in parentheses mean?
5       A.   It means that the tags were verified that it was
6  in the right position, and it's hung.
7            Does that answer your question?
8       Q.   That is actually hanging on the switch?
9       A.   Yes, that is actually hanging on the switch, in
10 the correct position.
11      Q.   Okay.  And so what specifically does that mean
12 that you did related to this tag-out?
13      A.   That I verified that the tags were correct after
14 being built.
15      Q.   What would Christopher Crespo have done?
16      A.   He would have built the tags.
17      Q.   Okay.  And that means he is the one who went in
18 the computer system and generated this sheet?
19           MS. LAWRENCE:  Objection to form.
20           THE WITNESS:  Not generate the sheet.
21           The computer, once I input my information,
22 generated the sheet.
23
24 BY MR. HENDRICK:
25      Q.   So he built the tag.  So can you tell me what

1  that means, that he built the tag?
2           That's what you told me, right, that he built the
3  tag?
4       A.    Yes.
5             So we have what they call ESAMS, and he went into
6  the system, after taking the WAF and whatever documents he
7  used, and said:  Okay.  These are the tags that is required
8  to tag the door in the open position.
9       Q.    Okay.
10      A.    Then he went in there, he put all the tags in the
11 system, and then he signed it, saying that he's built the
12 tags.
13      Q.    Okay.
14            There's also GSM3 Roberts on this sheet, in a box
15 for second person.
16            Do you know what GSM Roberts would have done for
17 this tag-out?
18      A.    Yes, sir.  He would have been the second person
19 in charge of going in and verifying those tags, that they
20 were accurate for the tag-out being -- for the tag-out being
21 hung.
22      Q.    So he is double-checking what Crespo has done?
23      A.    Yes, sir.
24      Q.    And you are the authorizing officer, so you said
25 you also went through and looked at some manuals and

1 maintenance cards?
2     A.    Yes, sir.
3     Q.    And did you check this to make sure that, based
4 on your view of the manuals and the maintenance cards, that
5 Mr. Crespo had built this correctly?
6     A.    Yes.
7     Q.    And then you went physically to the switch in the
8 engine room, to make sure that the tag was there?
9     A.    I do not physically go down to the space and make
10 sure that's there.
11     Q.    Okay. I misunderstood. I thought when it said
12 you were the authorizing officer to make sure the tag was
13 hung -- what does that mean, if it doesn't mean that you
14 actually go check for the tag?
15     MS. LAWRENCE:  Objection to form.
16     You can answer.
17     THE WITNESS:  So when we have a tag-out -- I'm
18 just going to explain the whole process a little bit.
19
20 BY MR. HENDRICK:
21     Q.    Please.
22     A.    So for yard periods, what we called them, when we
23 go through and build the tags, we have a first person.
24     They will build the tag for whatever we need, not
25 just pertaining to this case.

1      Then a second person would go in and verify the
2  tag-out, take all the documents that they use, verify, like,
3  if everything is on there.
4      After that's done, in this case, with RAs, repair
5  activities, that's what -- they have an opportunity to look
6  at those tags and say:  Okay.  Hey, these are the things
7  that I would like on the tag.
8      That's their opportunity to pretty much look at
9  it, and they sign the tags, saying that they are -- it's
10 verified and it's accurate.
11     Once that's completed, they come to CCS, Central
12 Control Station.  That's where they say:  Hey, we need to
13 hang these tags.
14     Me being the authorizing officer, that's when I
15 would take a look at it, after the three of them have gone
16 through and looked at it.  I would then go through, verify
17 it a fourth time, and then I would what they call issue the
18 tags.
19     The red -- the red Danger tag and the white
20 sticker would print off.  Once I hit "authorize," it would
21 print off from the computer.  We put it on there.
22     Then the first person -- this one being
23 Christopher Crespo -- he would take the first set of tags
24 and go hang the tags on, in this case, the switch.
25     Once he's done hanging that, he will sign the tag

1  as the first person.  Then he comes back to CCS, Central
2  Control Station.  He then gives the tag to the second
3  person, which would have been Roberts -- Austin Roberts.
4          He independently goes out, and he verifies the
5  tag.
6          At that point, the RA would then either go with
7  him, or he can go independently on his own after the fact,
8  to verify and sign the tags.
9          So the second person will then go down.  They
10 will verify the position, sign the tag, and then they will
11 bring that all back to CCS, Central Control Station.
12         And then that's where I would put the tags as
13 hanging.
14    Q.   So you say:  Put the tags as hanging.  That means
15 maybe mark in the computer system?
16    A.   Yes, sir.
17    Q.   Okay.  But you do not, as authorizing officer, go
18 walk through to verify that it's hung?
19    A.   No, sir.
20    Q.   Do you sign the red tag?
21    A.   Yes, sir.
22    Q.   Do you remember whether you signed this tag or
23 not?
24    A.   Yes, I would have signed it before they even had
25 taken it out of CCS.

1  Labor report that had some quotes that were attributed to
2  you.
3         Do you remember that?
4     A.  Yes.
5     Q.  It's Exhibit No. 5, I believe.
6         If you wouldn't mind turning to the second page
7  of that report, that paragraph we were looking at earlier,
8  the fourth one down.
9     A.  (The witness complied.)
10    Q.  In that paragraph, it says that you decided it
11 was best to leave the air pressure on the system, so the
12 pneumatics would hold the door in the open position while
13 work by the contractors was being conducted.
14        Do you agree with that statement?
15        MS. LAWRENCE:  Objection to form.
16        THE WITNESS:  That is what the document says.
17        I can't -- I don't know if I made that comment or
18 not, but that is what this document says.
19
20 BY MS. EATON:
21    Q.  But is it fair to say that you authorized the air
22 pressure to be left in the system on the blow-in doors?
23    A.  Yes.
24    Q.  Okay. Did you ever interact with Kelvin Buie?
25    A.  Just whenever he dropped off WAFs.