# EXHIBIT L

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                           NORFOLK DIVISION

 3

 4       -------------------------------------
                                              :
 5   DOUGLAS I. HORNSBY,                      :
     ADMINISTRATOR OF THE ESTATE OF           :
 6   CYNTHIA GARY,                            :
                                              :
 7            Plaintiff,                      :     CASE NO.:
                                              :     2:22cv427
 8   -vs-                                     :
                                              :
 9   UNITED STATES OF AMERICA,                :
                                              :
10            Defendant/Third-Party Plaintiff,:
                                              :
11   -vs-                                     :
                                              :
12   METRO MACHINE CORP.,                     :
     d/b/a GENERAL DYNAMICS NASSCO-NORFOLK    :
13   and                                     :
     ADVANCED INTEGRATED TECHNOLOGIES, L.L.C.,:
14                                            :
              Third-Party Defendants.         :
15       -------------------------------------

16

17

18            Deposition of Senior Chief Robbie Goff
              Taken on behalf of plaintiff.
19

20            Date:   August 30, 2024, at 9:30 a.m.

21            Place:  Norfolk, Virginia

22

23

24

25   Reported by:   Robin L. Delloro, R.P.R.
```

```
 1                    A P P E A R A N C E S

 2

 3   COUNSEL FOR THE PLAINTIFF:

 4        Mr. Andrew M. Hendrick
          RULOFF, SWAIN, HADDAD,
 5        MORECOCK, TALBERT & WOODWARD, P.C.
          317 30th Street
 6        Virginia Beach, VA 23451
          757-671-6000
 7

 8   COUNSEL FOR UNITED STATES OF AMERICA:

 9        Ms. Malinda R. Lawrence
          UNITED STATES DEPARTMENT OF JUSTICE
10        Civil Division, Torts Branch
          Aviation, Space & Admiralty Litigation
11        175 N Street NE 8th Floor
          Washington, DC 20002
12        malinda.r.lawrence@usdoj.gov

13

14   COUNSEL FOR METRO MACHINE CORP.:

15        Mr. Lynn K. Brugh, IV
          WILLIAMS MULLEN
16        200 South 10th Street, Suite 1600
          Richmond, VA 23219
17        804-420-6000
          lbrugh@williamsmullen.com
18

19   COUNSEL FOR ADVANCED INTEGRATED TECHNOLOGIES, L.L.C.,

20        Ms. Jennifer L. Eaton
          WOODS ROGERS VANDEVENTER BLACK, P.L.C.
21        101 West Main Street, Suite 500
          Norfolk, VA 23510
22        757-446-8600
          jennifer.eaton@wrvblaw.com
23

24

25
```

```
1           Deposition upon oral examination of Senior Chief
2  Robbie Goff, taken by and before Robin L. Delloro, R.P.R., a
3  Notary Public for the State of Virginia at Large, commencing on
4  August 29, 2024, at 10 a.m. at the offices of United States
5  Attorney's Office, Eastern District of Virginia, 101 West Main
6  Street, Suite 8000, Norfolk, Virginia, to be used as evidence
7  in the above-styled cause.
```

                    * * * * * * * * * * *

                         I N D E X
                          WITNESS

                                                    PAGE:

SENIOR CHIEF ROBBIE GOFF

    Examination by Mr. Hendrick                      7:9
    Examination by Ms. Eaton                       105:5
    Examination by Mr. Brush                       152:7
    Examination by Ms. Eaton                       226:17
    Examination by Mr. Brugh                       231:1
    Examination by Mr. Hendrick                    232:5
    Examination by Ms. Lawrence                    233:9
    Examination by Mr. Hendrick                    248:15
    Examination by Mr. Brugh                       255:10
    Examination by Ms. Eaton                       266:15
    Examination by Ms. Lawrence                    271:1

1  MS. EATON:  I think we wanted to get on the
2  record that all form objections that are made by one party
3  count for the other parties as well, just so we're not talking
4  over each other during the deposition, and then, Malinda, I was
5  curious because this is a 30(b)(6), and he is also testifying
6  in his personal capacity.  What is your preference to how to do
7  that?  Usually what I do is have him testify in both capacities
8  unless he indicates otherwise, but is there a preference in
9  this case?
10  MS. LAWRENCE:  My intention would be to allow all
11  of his testimony essentially serve both purposes, both
12  capacities, and then if we get to a point where the question is
13  outside of the scope for which he is designated as a 30(b)(6),
14  I will clarify that for the record but permit the witness to
15  answer in a factual capacity if he can because, as you know, in
16  the notice he is designated for --
17  MS. EATON:  Certain topics.
18  MS. LAWRENCE:  -- some but not all, some but not
19  all topics; so he can testify to what he can, and then, like I
20  said, if it's something that would be outside our 30(b)(6)
21  scope for this witness, I will clarify at that time if that's
22  acceptable to everyone?
23  MR. BRUGH:  Therefore, if you don't, then we can
24  assume it's for both factual and --
25  MS. EATON:  That saves us from having to ask him

1 transferred from the *Laboon* to the *USS McFaul*.
2           On the *McFaul* I served two different roles at
3 different times.  I was the 3-m coordinator for the first year
4 and a half that I was on board, and then I moved from being a
5 3-M coordinator to leading chief petty officer for main
6 propulsion division.  At that point, I made senior chief which
7 was -- I made E8.  I was selected for E8, and at that point, I
8 was moved over to fill the Top Snipe or senior enlisted
9 coordinator departmental LCPO role for the ship.
10      Q     Was the *McFaul* your last ship before you retired?
11      A     I went from the *McFaul* to the Assault Craft
12 Unit 4 for two years of shore duty, and I retired out of shore
13 duty.
14      Q     Let me ask you a little bit of detail about those
15 three jobs you mentioned on board the *McFaul*.  Can you tell me
16 what a 3-M coordinator is.
17      A     So all of our preventative maintenance is run
18 through the 3-M program; right?  That is our PMS cards,
19 preventative maintenance cards, that we use.  All right?  So
20 the ship is broken down into divisions, but beneath the
21 divisions, it's broken down into work centers; so there's
22 approximately 40 -- I believe there is about 40 work centers
23 on a DDG, and I'm -- as a 3-M coordinator was responsible for
24 coordinating all of the maintenance for all of the work
25 centers.

```
 1         Q     What does 3-M stand for?
 2         A     Maintenance, material, management.
 3         Q     You also said you were the leading chief petty
 4   officer for main propulsion division?
 5         A     Yes.
 6         Q     What does that mean?
 7         A     As an E-7 -- so main propulsion division is
 8   normally divided into main -- EM-01, which is Main Engine Room
 9   No. 1; EM-02, which is Main Engine Room No. 2; EB-14, which is
10   your oil test lab; EM L-4, which is your gas turbine systems
11   technicians electrical, your electricians, and FCA-1, which is
12   your gauge calibration.
13               So I was in charge of at different
14   points -- because at different times there was another chief
15   that was also helping me that he kind of came and went, but at
16   different times I was either in charge of all of the work
17   centers or all of the mechanical work centers, and he was in
18   charge of the electrical work centers, so normally how the
19   division of labor works -- so I was responsible for all -- at
20   that point all of the work that was happening in those work
21   centers.
22               Does that answer your question, sir?
23         Q     Yes.  Thank you.
24               Okay.  You also mentioned Top Snipe?  What's
25   that?
```

1 was an intake, if we didn't know off the top of my head -- so
2 I'm not great with numbers, the compartment numbers.  I always
3 forget them.  I would have looked up -- seeing it, Do you need
4 to be on the dirty side or the clean side?
5        And, like, if she had described where she was
6 looking, what we would have done is one of my guys would have
7 taken her down to Main 2 and showed her the correct way to go
8 up the space.
9     Q    If she is fire watch for the people doing the hot
10 work, is she going to be on the same side as the people doing
11 the work or would she be on the opposite side?
12     A    What do you mean?
13     Q    I mean if the hot work was on the clean side --
14     A    The hot work was not on the clean side.
15     Q    Okay.  Let me ask hypothetically if the hot work
16 is on the clean side and she is the fire watch, would she also
17 be on the clean side?
18     A    All right.  So --
19     Q    Or am I just talking nonsense completely?
20     A    You do have -- there's different situations for
21 different things.  It would depend where in the -- in your
22 hypothetical, it would have depended where in the clean side
23 they were welding; right?
24     So if they were welding on a point that was
25 adjacent to the bulkhead, then she may have been on the dirty

1  way to phrase it.
2          So in this instance -- and I believe you stated
3  earlier that Exhibit 15 is the relevant WAF form for the
4  blow-in door that was at issue in this accident?
5     A    0271 is the correct WAF.  It appears to be, yes,
6  sir.
7     Q    Okay.  And AIT had work that they needed to do,
8  the gasket work.  They submitted a WAF form to the WAF
9  coordinator which then led to the need for a tag-out of the
10 blow-in door; correct?
11         MS. LAWRENCE:  Objection to form.
12         THE WITNESS:  As far as I am aware, that is how
13 it happened, yes, sir.
14
15 BY MR. BRUGH:
16    Q    And then this form would be given to the WAF
17 coordinator which you believe to be a NASSCO Norfolk employee
18 or person that worked --
19    A    That a contractor would have given the WAF to the
20 WAF coordinator who would have then given the WAF to the
21 engineering duty officer.
22    Q    And do you know for this particular one, Exhibit
23 5, AIT would have given it to a NASSCO Norfolk WAF coordinator?
24    A    The only WAF coordinator that we had on the ship
25 at the time -- I do not remember his name.  I'm sorry, sir --

1  Q   That's all right.
2  A   -- but was not ship's force.  We only had one WAF
3  coordinator, and as far as I am aware, he was a NASSCO
4  employee.
5  Q   And then that NASSCO employee would then take it
6  to ship's force, which I believe you said was -- the EE --
7  A   Engineering duty officer.
8  Q   EDO?
9  A   EDO, yes, sir.
10  Q   Who then would work with the ship's force to
11  build out the tag-out?
12  A   Yes.  So the only thing that the engineering duty
13  officer is doing is letting the chiefs that run the work
14  centers know, Hey, these are the tags that are required to be
15  written today.
16      That normally happens in the morning because we
17  had a morning meeting; so the engineer duty officer would get
18  the WAFs early before the morning meeting, and we would all get
19  together, and he would be like, These are the WAFs that we
20  have.  Who owns this?  You got this.  You got this.
21      Oh, look.  You got three tags to write today.
22      That is normally how it worked.
23  Q   And after the WAF coordinator would give this WAF
24  to the EDO, the WAF coordinator didn't have any further
25  responsibility in building out the tag-out or authorizing it or

1  viewing it or anything, does he?
2       A      Not that I'm aware of, no.
3       Q      So the WAF coordinator, his sole role is to take
4  the submitted WAF from the contractor, give it to the EDO, and
5  then their role is done?
6              MS. LAWRENCE:  Objection to form.
7              You can answer.
8              THE WITNESS:  I would say that -- I would phrase
9  it a little bit different, that his -- the WAF coordinator
10 should be looking for conflicts in the work and areas, and he
11 also looks at the WAF to determine whether it requires an
12 isolation or not because all WAFs don't require isolation;
13 right?
14             So all WAFs don't have to go to the engineering
15 duty officer.  The WAFs that need to go to the engineering duty
16 officer are the ones that require an isolation.
17
18 BY MR. BRUGH:
19      Q      When you say "isolation," tag-out?
20      A      Yes, cautionary tag-out.
21      Q      Which is Exhibit 5 which is WAF 0271.  The WAF
22 coordinator did precisely what he was supposed to do which is
23 taking it to the EDO because there was an isolation required;
24 correct?
25      A      I would agree with that statement, yes.

1  Q    Once that was completed, that WAF coordinator
2  doesn't have any other role in building out the tag-out?
3       MS. LAWRENCE:  Object to form.
4       You can answer.
5       THE WITNESS:  Okay.  Can you rephrase that a
6  little bit?  I'm not quite sure what you're getting at.
7
8  BY MR. BRUGH:
9  Q    Sure.  Sure.  You mentioned once the EDO gets it,
10 the EDO takes it, and, in this case, it went to Officer
11 Crespo -- I don't know if he's an officer?
12 A    Petty officer.
13 Q    Petty officer -- who then builds the tag-out?
14 A    Yes.
15 Q    Which means -- is building out the tag-out the
16 same thing as drafting these documents?
17 A    It's all done on the computer; so it doesn't
18 really -- in the old system when we had paper tags, I would say
19 drafting would be a good word usage.  In this case, it's all
20 done in the computer.
21 Q    Right.  But when we think of building out, we
22 think of hammers, and there's no hammers.  It's putting in the
23 information --
24 A    Inputting the information for the document, that
25 is what petty officer did.

```
 1      Q     Okay.  The WAF coordinator has no role in that?
 2      A     Correct.
 3      Q     And then the -- I don't want to go through the
 4  whole process again, but -- we discussed at length here today
 5  the process that happens after Crespo gets this WAF No. 0271
 6  and drafts, builds out, whatever term we want to use, the
 7  paperwork necessary, gets the second person to check it, gets
 8  the authorizing officer to authorize it, and the RA authorizes
 9  it, and then there's this printed out that shows what tags need
10  to be printed and hung; correct?
11      A     What is the question?
12      Q     Well --
13      A     All that information -- all those steps are
14  correct, but what is the question?
15      Q     The question is, The WAF coordinator doesn't have
16  any role in that part of the process either?
17      A     No, sir.
18            MS. LAWRENCE:  Objection to form.
19            THE WITNESS:  Sorry.
20
21  BY MR. BRUGH:
22      Q     In your opinion, did the WAF coordinator do
23  anything incorrectly in his role in this request for a WAF,
24  No. 0271?
25            MS. LAWRENCE:  Objection to form.
```