## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | |
|---|---|
| DOUGLAS I. HORNSBY, Administrator of )<br>The Estate of CYNTHIA GARY, )<br> )<br>　　　　　Plaintiff, )<br> )<br>v. )<br> )<br>THE UNITED STATES OF AMERICA, *et al.,* )<br> )<br>　　　　　Defendants. )<br>＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿ ) | Case 2:22-cv-00427<br><br>In Admiralty |

## MEMORANDUM IN SUPPORT OF THE UNITED STATES'
## MOTION TO DISMISS OR FOR PARTIAL SUMMARY JUDGEMENT

## INTRODUCTION

This case arises out of a tragic fatal injury to Cynthia Gary that occurred during her duties as a land-based ship repair worker aboard the USS McFAUL (DDG 74). On March 15, 2021, Ms. Gary was found unresponsive with her body caught inside a piece of equipment onboard the vessel known as a blow-in door (BID), and was subsequently pronounced deceased. Plaintiff alleges that the Navy was negligent as follows: (1) the crew of the McFAUL incorrectly and negligently tagged out the control switch for the BID associated with the air intake for the #2 Ship's Service Gas Turbine Generator; (2) the crew of the McFAUL negligently failed to warn Ms. Gary of a latent defect in the BID control switch; and (3) the crew of the McFAUL negligently failed to intervene when Ms. Gary used the BID as an access point to the "clean side" of the air intake compartment. Plaintiff also challenges the Navy's tag out procedures for the BID control switch, and the design of the BID switch.

The United States moves for summary judgment or dismissal of Plaintiff's claims on the grounds that the United States has breached no legal duty owed to Plaintiff's decedent. The

United States' duties as the owner of the McFAUL are set forth by the seminal Supreme Court case *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981). Because there is no evidence that the United States violated any of the three *Scindia* duties, the Court should grant this motion for summary judgment or dismiss Plaintiff's claims against the United States. Simply put, Plaintiff's claims challenging the Navy's tag out procedures and the design of certain equipment on the McFAUL challenge conduct that is both discretionary and susceptible to policy analysis. Therefore, the discretionary function exception to the United States' waiver of sovereign immunity applies.

## STATEMENT OF UNDISPUTED FACTS

1.      On March 15, 2021, U.S. Navy Arleigh Burke-Class guided missile destroyer USS McFAUL (DDG-74) was located at the Metro Machine Corp. General Dynamics NASSCO-Norfolk (NASSCO) shipyard in Norfolk, Virginia for what is referred to as a "Maintenance Availability." A Maintenance Availability is an extended period of intense maintenance, repair, and refurbishment. This work was contracted to a prime ship repair contractor, in this case NASSCO, which in turn hired numerous subcontractors, for which it was contractually responsible. Ex. 1 at US000018-19, 72, 86.

2.      Under the contract governing the McFAUL Maintenance Availability, NASSCO was responsible for all work under the delivery order and all matters of contractor safety.  Ex. 1 at US000018-19, 86; Ex. 2 at US000110, 117; Ex. 3 at US0004749; Ex. 4 at AIT 000021.

3.      During the Maintenance Availability, the McFAUL was "laid up" and taken offline. The crew moved off of the vessel to a nearby berthing barge. A small component of the ship's crew, known as a duty section, remained with the vessel at all times and stood limited watches while the ship repair contractors performed their work. Ex. 5 at 16, 264; Ex. 6 at 66, 169.

4.      Frequently, to facilitate ship repair work, ship's systems requiring contracted maintenance were taken offline using a required "tagout" of the affected system and other supporting systems. The purpose of the tagout program is to provide for personnel safety and to prevent damage to equipment. The tagout process is governed primarily by the U.S. Navy Tag-Out Users' Manual, and for work conducted by contractors is a joint responsibility of the ship's crew (referred to as "ship's force") and the "Repair Activity," which is the contractor performing the work. Ex. 7 at US000608-612.

5.      The Navy Tag-Out Users' Manual directs the use of "danger tags to prohibit the operation or removal of equipment that could jeopardize the safety of personnel or endanger equipment, systems or components." Ex. 7 at US000614.

6.      A tagout typically involves correctly positioning switches, valves, breakers, etc., and then hanging yellow CAUTION tags or red DANGER tags on those components. The tags explicitly state which component they are attached to, as well as the position the switch, valve, or breaker is supposed to be in, and they serve as visible indications that components are not to be operated or repositioned until the tags are removed. Ex. 7 at US000614-615, 634-635.

7.      The tagout process is coordinated and overseen through a "Work Authorization Form" process ("WAF" process), coordinated by a NASSCO employee (referred to as the "WAF Coordinator"). Ex. 3 at US0004749; Ex. 8 ¶ 3.1; Ex. 9 ¶ 3.2.

8.      The scheduling and workflow process of the contracted work is coordinated and overseen by a series of NASSCO supervisors. Ex. 4 at AIT 000011-12, 14; Ex. 10 at US000168-177.

9.      NASSCO assigned its subcontractor, Advanced Integrated Technologies (AIT), numerous jobs under the Maintenance Availability Contract. Ex. 4 at AIT 000007-34. Among

them was replacing gaskets affixed to each of the vessel's seven moisture separator blow-in door panels. Ex. 3 at US0004913-4916; Ex. 4 at AIT 000024; Ex. 11 at 46-47.

10.     The BID is a bottom-hinged, pneumatically-operated door in a moisture separator panel located inside the air intake shafts for the ship's gas turbine engines. The moisture separator panels run the length of the intake compartments, separating them into two halves, commonly referred to as the "dirty side" and the "clean side." Ex. 12 at US0001366; Ex. 5 at 19.

11.     The normal position for the BID is closed, but it will open automatically when insufficient airflow passes through the moisture separator panel, thus ensuring an adequate supply of air to the ship's gas turbine engines while in operation. Ex. 12 at US0001334, 1341.

12.     On January 27, 2021, AIT's representative submitted a work authorization form (WAF), through NASSCO's WAF coordinator, requesting that the BID located in the ship's No. 2 Gas Turbine Generator intake be "tagged out in the open position" to facilitate the gasket replacement job. Ex. 13; Ex. 14.

13.     The ship's force, in accordance with the relevant procedures, manuals, and diagrams, US000614, US0012730-12732, US0001555-6, US0001579-1581, prepared a proposed tagout configuration to tagout the BID in the open position. Ex. 13; Ex. 14.

14.     The isolations necessary to tagout the BID were provided in the Navy's Maintenance Requirement Card (MRC) procedure specific to BID gasket replacement. These isolations did not include either de-energizing the BID system or removing the low-pressure air supply that provides the pneumatic power required to keep the doors open. Ex. 15 at US0001579-1581.

15.     No federal statutes, regulations or policies dictate how the Navy's Chief of Naval Operations (OPNAV) develops such maintenance policies or procedures. Ex. 25 (Declaration of Commander Stephen Andrews).  The Navy's Maintenance and Material Management System

(3M) has as its overarching goal maintaining "the highest practical level of material readiness and safety to meet operational availability requirements, while minimizing total life cycle cost over the expected life of the ship." *Id*. Similarly, the Navy's Reliability-Centered Maintenance (RCM) principles are intended to ensure "desired levels of safety, reliability, environmental soundness, and operational readiness in the most cost-effective manner." *Id*. The Navy's MRC and the Tag-Out Users' Manual were developed in accordance with these policies at the Navy's discretion.

16.     From a mechanical standpoint, the only way to ensure the BID remained in the open position was to keep pneumatic pressure supplied to the door while it was in the open position. Ex. 12 at US0001349, 1357; Ex. 5 at 34-36; Ex. 6 at 116-117.

17.     The proposed tagout was independently reviewed and verified by AIT, as required by the Tag-Out Users' Manual and the contract. Ex. 13; Ex. 14.

18.     The ship's force then opened the BID using the control switch located on the control panel in Main Engine Room No. 2 (MER 2), which is situated four decks below the BID. Once the BID was open, the ship's force attached a red DANGER tag to the switch, indicating that it must remain in the open position. Ex. 13; Ex. 14; Ex. 16 at 22-23.

19.     Placement of the tag was required to be independently verified by aA second member of the ship's crew and a representative of AIT.[1] Ex. 7 at US000611-612, 636; Ex. 13; Ex. 14; Ex. 16 at 14, 18, 22-23; Ex. 24.

---

[1] While AIT's Repair Activity representative, who had concurred in the tagout configuration, represented to the crew that he had verified and signed the tag as required, in fact he left the tag unsigned. Ex. 24



*Tag out for the BID control switch, CMS 0276*

20.     With a completed tagout of the BID in the open position, AIT was authorized to conduct the BID gasket removal and replacement on January 29, 2021, however, six weeks passed as AIT neither completed the work, nor did it advise that it would be delayed, which would have caused the BID tag to be cleared and the BID returned to its normal closed and secured position. As a result, the BID remained tagged out in the open position. Ex. 5 at 141-142; Ex. 13; Ex. 14; Ex. 17 at 18.

21.     Meanwhile, NASSCO and its subcontractors commenced unrelated work in and around the intake compartment in which the tagged-out BID was located. Ex. 5 at 187-190; Ex. 10 at US000167-177.

22.     On the morning of March 15, 2021, Cynthia Gary boarded the McFAUL to perform duties as a fire watch for welding work being performed by a NASSCO subcontractor.[2] Ms. Gary was assigned fire watch duties in the clean side of the compartment where #2GTG BID was

---

[2] A fire watch monitors a space while nearby workers conduct "hotwork" that has the potential to cause a fire. Should a fire occur, the fire watch takes immediate action to report or extinguish it.

tagged out in the open position. Those duties were unrelated to the BID gasket replacement work that AIT had not yet completed. Ex. 18; Ex. 19.

23.     At some point, Ms. Gary leaned through the open BID, with her head, arms, and torso on the clean side, while her hips and legs remained on the dirty side. This was not a normal or approved way of accessing the clean side of the compartment. Ex. 5 at 16-19, 24, 191-192; Ex. 12 at US0001330, 1407.

24.     At approximately 7:40 a.m. on March 15, 2021, Ms. Gary was discovered trapped in the BID, which had closed. Because the accident was unwitnessed, it is assumed that Ms. Gary was leaning through the BID opening when the control switch was somehow moved from the open to the close position, causing the BID to close. Ex. 5 at 16-19; Ex. 19; Ex. 20 at US000302.

25.     A civilian contractor reported the accident to the McFAUL's Officer-of-the Deck, who immediately announced a medical emergency over the ship's general announcing system. Personnel from the McFAUL's engineering department responded and disconnected the pneumatic air pressure to the door, allowing it to open. Ex. 5 at 17-18.

26.     Ms. Gary was evacuated to Norfolk Sentara Hospital where she was pronounced deceased. Ex. 18; Ex. 21.

27.     After the accident, the ship's crew discovered that the control switch for the #2GTG BID panel located in MER 2 had been turned to the closed position. The DANGER tag was still hanging from the switch, indicating it was to remain in the open position. Ex. 5 at 19; Ex. 22.

28.     While we know that Contractors were working in MER 2 that morning, it is unknown what caused the switch to turn. There is no evidence that any United States employee or military member was in MER 2 that morning. Ex. 23.

29.     Further investigation revealed that, although the BID control switch is designed as a "push-to-turn" switch, requiring it to be depressed before it can be turned, it was able to be moved between positions without being pushed in to turn, contrary to its design and normal operation. It is not known whether the switch had lost "push-to-turn" functionality prior to the accident, or whether it was damaged by whatever impact caused it to turn, triggering the accident.  Ex. 5 at 38.

## ARGUMENT

## I.    STANDARDS OF REVIEW

### A.  Fed. R. Civ. P. 56

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, the burden for summary judgment may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmovant "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, (1968)). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 257. And while the evidence should be viewed in the light most

favorable to the nonmoving party and all justifiable inferences drawn in its favor, *Anderson*, 477

U.S. at 255, a mere "scintilla" of evidence will not preclude summary judgment. *Id.* at 252.

   **B.  Fed. R. Civ. P. 12(b)(1)**

   A motion to dismiss under Fed. R. Civ. P. 12(b)(1) tests subject-matter jurisdiction,

which is the court's "statutory or constitutional power to adjudicate the case." *Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). A defendant can mount either a facial or a

factual attack upon the court's subject-matter jurisdiction. *See Hutton v. Nat'l Bd. of Exam'rs in*

*Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018); *Kerns v. United States*, 585 F.3d 187, 192

(4th Cir. 2009); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

   A facial attack asserts that a complaint fails to allege facts upon which to base subject-

matter jurisdiction. *See Hutton*, 892 F.3d at 621 n.7; *Adams*, 697 F.2d at 1219. The court takes

the factual allegations of the complaint as true in evaluating a facial challenge to subject-matter

jurisdiction. *See Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017); *Kerns*, 585 F.3d at 192.

Materials outside the pleadings are not considered. *Thigpen v. United States*, 800 F.2d 393, 401

n.15 (4th Cir. 1986), *overruled on other grounds, Sheridan v. United States*, 487 U.S. 392 (1988)

   In contrast, a factual attack – which the government mounts here - challenges the

truthfulness of the jurisdictional allegations in the complaint. *Thigpen*, 800 F.2d at n.15. The

court regards the pleadings as mere evidence on the issue, and it may consider evidence outside

the pleadings without converting the proceeding to one for summary judgment. *Richmond,*

*Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *White*

*Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005); *Evans v. B.F. Perkins Co.*, 166

F.3d 642, 647 (4th Cir. 1999).

When a Rule 12(b)(1) motion challenge is raised, the plaintiff bears the burden of proving that the Court has subject matter jurisdiction. *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768. To prevent dismissal, "the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Id*. A dismissal should be granted when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id. See also Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (the proper practice is to dismiss for lack of jurisdiction under Rule 12(b)(1), not to grant summary judgment under Rule 56(c)) (citing *Broussard v. United States*, 989 F.2d 171, 177 (5th Cir. 1993)).

In this case, the United States makes a factual attack on Plaintiff's complaint and relies on evidence outside the pleadings in support of its argument that sovereign immunity has not been waived for some of Plaintiff's claims. The United States' Rule 12(b)(1) arguments are set forth in section IV of this brief.

## II.    THE PUBLIC VESSELS ACT IS THE APPROPRIATE WAIVER OF SOVEREIGN IMMUNITY.

The United States, as sovereign, is immune from suit except where it consents to be sued, and the terms of its consent define a court's jurisdiction. *United States v. Sherwood,* 312 U.S. 584, 586 (1941). The consent to be sued cannot be implied and must be unequivocally expressed and strictly construed in the United States' favor. *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33-34 (1992); *Library of Congress v. Shaw,* 478 U.S. 310, 318 (1986). If sovereign immunity is not waived, there is no subject matter jurisdiction. *United States v. Testan*, 424 U.S. 392, 399 (1976).

Plaintiff alleges that this case falls within the Court's admiralty jurisdiction (Am. Comp., Doc. 21 ¶11). The United States does not dispute this assertion, as the case involves

10

a fatal injury sustained by a shore-based worker on a Navy ship located in navigable waters.

*Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001) (applying admiralty

law in a case involving a shore-based repair worker who died while working aboard a ship

that was berthed in navigable waters).

The Suits in Admiralty Act and the Public Vessels Act permit admiralty suits to be

brought against the United States for causes of action arising out of the operation

of vessels owned by or operated for the United States. *Manuel v. United States*, 50 F.3d

1253, 1255 (4th Cir. 1995).  Because this case involves allegations of damage caused by a

public vessel of the United States, the McFAUL, the Public Vessels Act (PVA) is the more

specific waiver. 46 U.S.C. § 31102 (an *in personam* civil case in admiralty may be brought

for damages caused by a public vessel of the United States). *See also United States v. United

Continental Tuna Corp.,* 425 U.S. 164, 167 n.1 (1976) (a naval destroyer is "beyond

question a 'public vessel'"); *Kelly v. United States*, 579 F. Supp. 3d 751, 755 (D. Md. 2022)

(generally, suits for damages caused by public vessels fall under the PVA, and all other

admiralty claims against a federally-owned vessels fall under the SAA) (citing *Sys.

Application & Techs., Inc. v. United States*, 491 F. Supp. 3d 73, 81 n.4 (D. Md. 2020). These

two statutes operate similarly, *Kelly*, 579 F. Supp. 3d at n.4 (citing *Ali v. Rogers*, 780 F.3d

1229, 1234 (9th Cir. 2015) (The PVA makes all claims subject to the SAA, including its

statute of limitations and its exclusivity provision, except to the extent to which the two are

inconsistent); *Servis v. Hiller Sys. Inc.*, 54 F.3d 203, 206 (4th Cir. 1995) ("The PVA

incorporates the SAA's exclusivity provision."), and any differences between these waivers

of sovereign immunity are not relevant to this action.

With admiralty jurisdiction comes the application of substantive admiralty law and, absent a relevant statute, the general maritime law, as developed by the judiciary, applies. *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986). For the most part, admiralty tort claims against the United States are analyzed in the same manner as admiralty tort claims against private parties. 46 U.S.C. § 30907 ("A civil action under this chapter shall proceed and be heard and determined according to the principles of law and the rules of practice applicable in like cases between private parties."). Thus, to plead negligence, a plaintiff must establish that the government owed a duty of care; that the government breached that duty; and that the government's breach of duty was a proximate cause of the plaintiff's injuries. *McMellon v. United States*, 338 F.3d 287, 293 (4th Cir. 2003), vacated *en banc* on other grounds, 387 F.3d 329 (4th Cir. 2004).

## III.   SUMMARY JUDGMENT SHOULD BE ENTERED IN THE UNITED STATES' FAVOR AND PLAINTIFF'S CLAIMS AGAINST THE UNITED STATES SHOULD BE DISMISSED BECAUSE THE NAVY DID NOT VIOLATE ANY DUTIES THAT ARISE UNDER THE *SCINDIA* DOCTRINE.

Plaintiff brings this claim against the United States pursuant to the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S C. §§ 901–950. Under section 5(b) of the Act, "a shipowner is liable for an injury to a covered person only where the injury is caused by the ship's negligence." *Bonds v. Mortensen & Lange*, 717 F.2d 123, 126 (4th Cir. 1983). Section 905(b) of the LHWCA provides in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred....

33 U.S.C. § 905(b).

In this context, the term 'vessel' means "any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21).

"While Congress created a cause of action against the shipowner in negligence in § 905(b), it left to the courts the task of defining the duties the shipowner owed to the longshoreman." *Provence v. United States*, 661 F.Supp.3d 459, 464 (D.S.C. 2023) (citing *Lincoln v. Reksten Mgmt.*, 354 F.3d 262, 266 (4th Cir. 2003); *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 165–66 (1981)). In *Scindia*, the Supreme Court considered the nature of a longshoreman's claim for vessel negligence, and established three distinct, but limited, duties owed by the shipowner to a harbor worker:

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. *See* 451 U.S. at 167. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." *Ibid.* The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

*Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994) (quoting *Scindia*, 451 U.S. at 167-78).

While *Scindia* and *Howlett* involved injuries sustained during cargo operations, the narrow duties of the shipowner apply equally to ship repair contractors. *Deyerle v. United States*, 149 F.3d 314, 316 (4th Cir. 1998) (applying *Scindia* in a case involving an injury to a ship repair worker). *See also Provence v. United States*, 661 F. Supp. 3d 459, 464 (D.S.C. 2023); *Bates v. Merritt Seafood, Inc.*, 663 F. Supp. 915, 926 (D.S.C. 1987) ("Although *Scindia* only addressed the vessel owner's duty to a longshoreman, subsequent decisions have held that its principles

generally apply to all independent contractors and their employees.") (citing *Hill v. Texaco, Inc.*, 674 F.2d 447 (5th Cir. 1982)).

In this case, the United States owned the McFAUL, and Cynthia Gary was an employee of a subcontractor employed by the prime contractor, NASSCO. Ms. Gary was working aboard the McFAUL as a ship repair worker. As the ship owner, the United States owed three duties to shore-based ship repair workers such as Ms. Gary:  1) the turnover duty, 2) the active control duty and 3) the duty to intervene. Because the United States did not breach any of these duties, summary judgment should be entered in favor of the United States.

A.    **The Turnover Duty**

The "turnover duty" focuses on the shipowner's obligation before or at the commencement of stevedoring (or repair) operations. *Howlett*, 512 U.S. at 98; *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 392 (5th Cir. 2008). "[T]he turnover duty involves the state of the ship and its equipment upon the commencement of stevedoring operations." *Price v. Atlantic Ro-Ro Carriers*, 45 F. Supp. 3d 494, 506 (D. Md. 2014) (citing *Howlett*, 512 U.S. at 98). In the context of a ship repair worker's injury, the Fourth Circuit summarized the duty as follows:

> This "turnover duty" thus requires that the shipowner exercise due care to ensure that the ship is safe enough when turned over to the stevedore to allow the stevedore, exercising reasonable care, to perform cargo operations safely, and that the stevedore be warned of any hidden defects that are known or should be known to the shipowner.

*Deyerle*, 149 F.3d at 316 (quoting *Scindia*, 451 U.S. 156). The "turnover duty" has two components, to turn over a reasonably safe space and to warn of latent hazards:

> This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that

14

are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Scindia*, 451 U.S. at 166-67.

The duty to warn attaches only to latent hazards, which are defined in this context as "hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Howlett*, 512 U.S. at 99. *See also Bunn v. Oldendorff Carriers GmbH & Co. KG*, 723 F.3d 454, 461 (4th Cir. 2013) ("[i]f a defect is open and obvious and the stevedore should be able to conduct its operations around it safely, the shipowner does not violate the duty to warn"). "Given the *Howlett* Court's clear language strictly limiting the vessel's turnover duty to warn to *latent* defects and dangers, it makes no sense to say that the vessel is nevertheless liable to the longshoremen for breach of the duty to turnover a safe ship based on an *obvious* defect against which it had no duty to warn." *Kirksey*, 535 F.3d at 395 (emphasis in original).

In *Deyerle*, 149 F.3d at 315, for example, plaintiff was injured during repairs to a public vessel and sued the United States. *Id.* The injury occurred while the plaintiff was removing power cables from the ceiling in a ship's computer room, which had been turned over to the contractor for repair. *Id.* In affirming summary judgment for the United States, the Fourth Circuit found no breach of the *Scindia* duties as plaintiff's employer was "a repair contractor hired specifically to replace and repair the very equipment on which Deyerle was injured." *Id.* at 316. The *Deyerle* Court continued:

> To hold a shipowner liable to repairmen for injuries resulting from the very equipment they have been hired to repair would, in many cases, effectively render the shipowner an insurer of all repair operations, a result that Congress clearly did not intend by its 1972 Amendments to the LHWCA, which were designed to eliminate the essentially strict liability regime of "seaworthiness" and to establish a negligence regime.

*Id.* (citing *Scindia*, 451 U.S. at 165).

The *Deyerle* Court observed that it would be "manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe." *Id.* (quoting *West v. United States*, 361 U.S. 118, 123 (1959)); *see also Stass v. Am. Com. Lines, Inc.*, 720 F.2d 879 (5th Cir. 1983) (affirming summary judgment for vessel where a repair worker was injured in course of barge repairs that the contractor was hired to perform); *Kirby v. OMI Corp.*, 1989 AMC 1079 (Fl. Cir. Ct. 1989) (finding no breach of duty by vessel owner to plaintiff's decedent in shipyard accident); *Peters v. Titan Navigation Co*., 857 F.2d 1342 (9th Cir. 1988) (finding, in § 905(b) actions, shipowner has no negligence liability when repair worker is injured by very condition he is hired to repair); *Rose v. Cargill, Inc*., No. 14-2406, 2015 WL 4042151 (E.D. La. July 1, 2015) (no duty to warn experienced worker hired to clean vessel of slipping hazards he was hired to clean); *Velez v. Laredo Offshore Services, Inc*., No. G-09-241, 2010 WL 2757489 (S.D. Tex. July 13, 2010) (finding no breach of turnover duty where repair contractor's work created the danger that made the vessel unsafe).

In this case, the McFAUL was undergoing a comprehensive ship repair project at the NASSCO shipyard. Part of the work involved replacement of a rubber gasket that surrounded the perimeter of the BID located inside the air intake for the #2 gas turbine generator. At the request of the subcontractor AIT, the control switch for the BID was tagged out in an open position. This meant that the control switch was equipped with a red danger tag which prohibited operation of the switch. The BID was to remain open until gasket repairs were completed and the tag out was removed. In normal shipboard operations, the presence of the red danger tag would be sufficient to ensure that the control switch was not operated and the BID remained in an open position. In

16

this case, however, the switch was activated in an unknown manner by an unknown third party, causing the BID to close and crush Ms. Gary.

As mentioned, the turnover duty has two components – the first requires the shipowner to turn over the ship in a condition such that an expert ship repair contractor can carry on its repair operations with reasonable safety. The United States satisfied this duty. There is no evidence of any defect with the BID itself, and no evidence that it closed on its own (i.e., without the control switch being moved). As to the BID control switch, there is no evidence that there was any defect with this switch which existed before Ms. Gary's injury and death. And while there is evidence that the Navy found the switch was not operating properly after the accident, it is not known whether this condition pre-existed the accident. Furthermore, even if the BID control switch was defective, the ship repair contractors certainly could have conducted their work safely because: 1) if the tag out had been complied with and the BID control switch not moved to the close position, the BID would not have closed, and 2) if Ms. Gary had not been improperly leaning through the BID opening when it closed, she would not have been injured when it closed. The Navy exercised ordinary care under the circumstances and turned over the McFAUL in such condition that an expert ship repair contractor could have performed its work with reasonable safety.

The second component concerns a duty to warn of latent conditions that would likely be encountered by the ship repair contractors, when those conditions are known or should be known with the exercise of reasonable care. There is no dispute that the Navy did not know that the BID control switch on the McFAUL was defective prior to Ms. Gary's injury (if, in fact, it was defective prior to the accident). And even if the BID control switch on the McFAUL no longer had to be pushed before it could be turned, and even if this can be considered a latent condition,

it was not known and it was not something that should have been known by the Navy with the exercise of reasonable care. The United States did not violate any duty to warn of any defect with the BID control switch because it was not aware that any defect existed prior to the accident (if, indeed, any defect did exist before the accident).

### B.    The Active Control Duty

The second duty is known as the "active control duty." Once a ship repairer's operations have commenced, the shipowner's duties narrow considerably. *See Spence v. Mariehamns R/S*, 766 F.2d 1504, 1507 (11th Cir. 1985). The Fourth Circuit has summarized the active control duty as follows:

> Under the active control duty, a vessel owner is liable if it either "actively involves itself in the cargo operations and negligently injures a longshoreman" or "fails to exercise due care to avoid exposing longshoremen to harm from hazards that they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation."

*Price v. Mos Shipping Co.*, 740 F. App'x 781, 783 (4th Cir. 2018) (citing *Scindia*, 451 U.S. at 167; *Gravatt v. City of New York*, 226 F.3d 108, 121 (2d Cir. 2000); *England v. Reinauer Transp. Cos., LP*, 194 F.3d 265, 270 (1st Cir. 1999)).

The "mere presence of an officer of the ship's crew does not constitute 'active involvement' in discharge operations within the meaning of *Scindia*." *Price*, 740 F. App'x at 783 (citing *Bonds v. Mortensen & Lange*, 717 F.2d 123, 124 n.4 (4th Cir. 1983). *See also Bates*, 663 F. Supp. at 926 ("control must have been over the actual methods of work used by the independent contractor and the operative detail") (citing *Cowsert v. Crowley Maritime Corp.*, 680 P.2d 46, 101 Wash.2d 402 (1984)). This is true even if the ship's crew members had the authority to intervene in the event an unsafe condition developed. *Harris v. Pacific-Gulf Marine, Inc.*, 967 F. Supp. 158, 164 (E.D. Va. 1997) (citing *Bonds*, 717 F.2d at 127 n.4).

In this case, the Navy did not have active control over the repair work being conducted by NASSCO and its subcontractors. Instead, the timing and methodology of the BID gasket replacement, and the timing and methodology of the "hot work" that was being one when Ms. Gary was injured, were completely under the control of NASSCO and its subcontractors. The Navy: 1) did not supervise this work, 2) did not specify how the work was to be done, and 3) did not have any active involvement with the work as it was being done. While the Navy certainly had personnel aboard the ship during the repair work, this alone does not amount to "active" control of the work. *Price*, 740 F. App'x at 783. Accordingly, because there is no genuine issue of material fact regarding whether the Navy assumed active control of the repair activities at issue, summary judgment on this aspect of the United States' *Scindia* duties should be granted.

## C. __The Intervention Duty__

The third and final duty, referred to as the 'duty to intervene,' concerns "the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore" or, as in this case, the ship repair contractor (NASSCO) and its subcontractors. *Howlett*, 512 U.S. at 98. In considering the duty to intervene, the Supreme Court held that, a vessel "has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.* at 101. *See also Price*, 740 F. App'x at 783 (a vessel owner generally owes no duty to the longshoremen to inspect or supervise cargo operations and may rely on the judgement of the stevedore to avoid exposing longshore workers to unreasonable risks of harm). Intervention is required, however, "when the vessel owner knows that the stevedore's judgment in carrying out his tasks is 'obviously improvident' under the

circumstances." *Price*, 740 F. App'x at 783 (citing *Bonds*, 717 F.2d at 127). In this regard, the vessel owner violates the intervention duty if it:

> fails to intervene in the stevedore's operations when he has actual knowledge that both: (1) a hazardous condition exists; and (2) the stevedore, in the exercise of obviously improvident judgment means to work on in the face of it and therefore cannot be relied on to remedy it.

*Price,* 740 F. App'x at 783. Thus, the vessel's officers and crew must have actual knowledge of a specific danger and that the contractor's continued work is obviously improvident:

> If the shipowner may reasonably believe, despite its own knowledge of the danger, that the stevedore will act to avoid the dangerous conditions, the owner cannot be said to have been negligent, as the decision whether a condition imposes an unreasonable risk of harm to longshoremen is a matter of judgment committed to the stevedore in the first instance.

*Id*. at 783-84 (citing *Hodges v. Evisea Maritime Co., S.A.*, 801 F.2d 678, 687 (4th Cir. 1986)).

"Obviously improvident judgment" requires a showing that the repair worker "must use an object with a defective condition or follow a procedure that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm even when [the repair worker's] expertise is taken into account." *Aguilar v. Bollinger Shipyards, Inc*., 833 F. Supp.2d 582, 593 (E.D. La. 2011) (citing *Clay v. Daiichi Shipping*, 74 F. Supp.2d 665, 673 (E.D. La. 1999), *aff'd* 237 F.3d 631 (5th Cir. 2000)). *See also Burns v. D. Oltmann Maritime PTE Ltd*., 901 F. Supp. 203, 208 (E.D. Va. 1995) (noting that only the most egregious decisions by the stevedore are "obviously improvident" and give rise to the shipowner's duty to intervene); *Harris*, 967 F. Supp. at 165 (same).

The intervention cases uniformly require: (1) the shipowner's "actual knowledge" of a hazardous condition and (2) the shipyard's "obviously improvident" judgment in continuing the hazardous work. *Price*, 740 F. App'x 783. Here, however, the Navy was not supervising the work of NASSCO or its subcontractors. It was unaware of any "obviously improvident"

judgments or actions that caused Ms. Gary's injury, and no Navy personnel saw the incident that caused the BID control switch to be moved from the open to close position. Accordingly, there was no opportunity for any member of the ship's force to prevent this accident, either by ensuring that the BID control switch remained set to "open," or by ensuring that Ms. Gary refrained from improperly leaning through the BID.

Instead, it was the prime contractor and its sub-subcontractors that had the opportunity (and arguably the duty) to ensure that the repair workers were conducting the work safely and not exposing themselves to unreasonable and/or unnecessary risks. Under the circumstances, the duty to intervene was not violated and summary judgment should be granted in the United States' favor on this aspect of the United States' *Scindia* duties. *Id.* (noting that liability should not be imposed on the United States where the repair contractor was clearly in a better position than the United States to avoid the accident) (citing *Scindia*, 451 U.S. at 171 (quoting *Italia Societa v. Oregon Stevedoring Co.*, 376 U.S. 315, 322-23 (1964)).

In conclusion, while Ms. Gary's accident was tragic, the Navy is not at fault. As the Fourth Circuit has observed, it would be "manifestly unfair" to apply the requirement of a safe place to work to the shipowner when it has no control over the ship or the repairs, and the repair work creates the danger which makes the place unsafe. *Deyerle*, 149 F.3d at 316 (quoting *West*, 361 U.S. at 123). To hold that the Navy should have supervised NASSCO's operations and ensured that NASSCO's employees, and its subcontractors' employees, did not act in a manner which could cause injuries "runs contrary to the underpinnings of *Scindia* and would virtually require the provision of a supervisor for every [repair worker] in the yard." *Aguilar*, 833 F. Supp. 2d at 594. Because there are no genuine issues of material fact regarding whether the United States violated any duties owed to Ms. Gary under *Scindia* and its progeny, summary judgment

should be granted in the United States' favor, and all of Plaintiff's claims against the United States should be dismissed.

## IV. THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY WHEN GOVERNMENT EMPLOYEES HAVE EXERCISED DISCRETION IN MATTERS THAT ARE SUSCEPTIBLE TO POLICY ANALYSIS.[3]

While the PVA is the appropriate waiver of sovereign immunity in this case, the Federal Tort Claims Act (FTCA), 28 U.S.C. §§2671-2680, provides a significant exception to the United States' waiver of sovereign immunity, which courts apply in SAA and PVA cases. Section 2680 of the FTCA provides that sovereign immunity is not waived for:

> Any claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

This is the "discretionary function exception," and it applies in SAA and PVA cases. *McMellon v. United States*, 387 F.3d 329, 434 (4th Cir. 2004) ("We now conclude that separation-of-powers principles require us to read into the SIAA's waiver of sovereign immunity a discretionary function exception."); *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 184 (4th Cir. 2015) (the PVA also contains an implied discretionary function exception).

The discretionary function exception is intended to prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. *United States v. S.A. Empressa de Viacao Aerea Rio Grandense (Varig),* 467 U.S. 797, 814 (1984). Anchored in the

---

[3] If the United States' motion for summary judgment is not granted, then the United States seeks, in the alternative, dismissal of claims which are barred because sovereign immunity has not been waived.

constitutional doctrine of separation of powers, the discretionary function exception applies if the challenged action involves the permissible exercise of policy judgment. *Berkovitz v. United States,* 486 U.S. 531, 537 (1988).

In a series of cases, the Supreme Court has set forth the discretionary function analysis. *See United States* v. *Gaubert,* 499 U.S. 315 (1991); *Berkovitz,* 486 U.S. 531 (1988); *Varig,* 467 U.S. 797 (1984); *Dalehite* v. *United States,* 346 U.S. 15 (1953). A two-part test is applied to determine whether the challenged conduct falls within the discretionary function exception. Under the first part of the test, the relevant inquiry is whether a controlling statute or regulation mandates that an agent of the United States must perform a function in a specific manner. *Gaubert*, 499 U.S. at 324.  It is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception will apply. *Varig,* 467 U.S. at 813. According to the Supreme Court, the discretion referred to is "the discretion of the executive or the administrator to act according to one's judgment of the best course." *Dalehite*, 346 U.S. at 34. Only if a federal statute, regulation, or policy "specifically prescribes a course of action embodying a fixed or readily ascertainable standard," will the government employee's conduct fall outside of the discretionary function exception. *Gaubert,* 499 U.S. at 322.

If the court finds that the challenged conduct is discretionary, the court must decide whether the judgment afforded government employees is the type of judgment that the discretionary function exception was designed to shield. *Gaubert,* 499 U.S. at 322-23. When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, there is a strong presumption that the agent's acts are grounded in policy when exercising that discretion. *Id.* at 324. Thus,

the United States need not prove that particular policy factors were, in fact, balanced during the course of making the challenged decision. *Id*. at 325. Consistent with this presumption, the focus of the discretionary function inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis. *Id.*

Because the standards governing FTCA and SAA/PVA discretionary function cases are the same, the court may consult FTCA discretionary function cases for guidance in SAA/PVA cases. *Wu Tien Li-Shou*, 777 F.3d at 184. Ultimately, it is plaintiff's burden to establish that the discretionary function exception does not bar plaintiff's claims. *Bulger v. Hurwitz*, 62 F.4th 127 (4th Cir. 2023); *Sanders v. United States*, 937 F.3d 316, 327 (4th Cir. 2019). If the discretionary function exception applies, the court lacks subject matter jurisdiction, and dismissal pursuant to Fed. R. Civ. P. 12(b)(1) is required. *Indemnity Ins. Co. of North America v. United States*, 569 F.3d 175, 180 (4th Cir. 2009); *Williams v. United States*, 50 F.3d 299, 305 (4th Cir. 1995) ("[I]f we conclude that the discretionary function exception applies to preclude this action against the United States proper, the suit must be dismissed for want of subject matter jurisdiction under Rule 12(b)(1).").

In this case, Plaintiff challenges the Navy's procedures for tagging out a control switch for a BID aboard the McFAUL and the design of that control switch. As discussed below, because such claims challenge conduct that is both discretionary and susceptible to policy analysis, the claims fall within the discretionary function exception and are subject to dismissal for lack of subject matter jurisdiction.

**A. The discretionary function exception applies to Plaintiff's claims challenging the procedures the Navy established to tag out BIDs on its destroyers because such decisions are discretionary and susceptible to policy analysis.**

As a matter of well-established law, where a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow, the employee has "no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. And "if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324. This is true even if the applicable policy is embodied within an internal guideline as opposed to a published regulation. *Id. See, e.g., Indemnity Ins. Co.*, 569 F.3d at 175 (applying the discretionary function exception to a case involving alleged noncompliance with a Coast Guard Marine Safety Manual).

In this case, the Navy formulated procedures governing the tag out of equipment such as the control switches for BIDs. The Navy personnel responsible for tagging out the BID followed those procedures, and the proper tag out was confirmed by one of NASSCO's subcontractors, AIT. Thus, there is no evidence to challenge a conclusion that the Navy (and AIT) properly tagged out the BID. Because the BID control panel tag out procedure was fully complied with, noncompliance with mandatory procedures is foreclosed as an avenue for recovery.

Furthermore, the directives themselves are not susceptible to challenge because they are discretionary. There are no statutes or regulations that specify the exact procedures that must be adopted for tagging out BID control switches. Discretion existed, and the only remaining question is whether the Navy's discretionary choice is susceptible to policy analysis. In developing the maintenance procedures governing the tagging out of the BID controller, the Navy would have considered a number of policy-based factors, including achieving "safety, reliability, environmental soundness and operational readiness" in a cost-effective manner. Such considerations, in the context of developing maintenance procedures, are susceptible to policy

analysis. *See, e.g.*, *Baum v. United States*, 986 F.2d 716, 724 (4th Cir. 1993).

**B. The discretionary function exception applies to Plaintiff's claims challenging the design of equipment such as the BID control switches on the McFAUL.**

Plaintiff claims that the United States is negligent because the McFAUL contained a BID control switch that was improperly designed.  With respect to the design of BID control switches installed on Navy destroyers, there are no federal statutes, regulations, or policies prescribing any specific courses of action for government employees to follow. In other words, discretion exists regarding the type of switch to use. When discretion exists, it must be presumed that the acts in question are grounded in policy when the discretion is exercised. *Gaubert*, 499 U.S. at 324.

In this case, we are dealing with the design of equipment aboard a Navy destroyer. It is well established that the United States has not waived sovereign immunity for claims challenging the design of military equipment such as the McFAUL, including its component parts. *See Boyle v. United Tech. Corp.,* 487 U.S. 500, 511 (1988) ("We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision."); *Wu Tien Li-Shou*, 777 F.3d at 185 (noting the Supreme Court's holding that "the selection of the appropriate design for military equipment . . . is assuredly a discretionary function."); *Carney v. United States*, 368 F. Supp. 2d 439 (D. Md. 2005) (design defects in the United States Naval Vessel YANO's fan room, even those dealing with mundane matters like lighting and handholds, fall within the discretionary function exception because, exercising its discretion, the government accepted the entire ship as converted, with any potential defects); *Baldassaro v. United States*, 64 F.3d 206 (5th Cir. 1995) (seaman's claim challenging the design of bunk beds on the CAPE CARTHAGE, a National Defense Reserve Fleet ship, was barred by the discretionary function exception); *Baum,* 986 F.2d at 722 (design of guardrails on a National Park Service roadway was discretionary). Therefore, to

the extent that Plaintiff challenges the design of the BID control switch on the McFAUL, such claim is subject to dismissal for lack of subject matter jurisdiction because it falls within the discretionary function exception.

## **CONCLUSION**

In conclusion, the United States' motion for summary judgment should be granted and Plaintiff's claims against the United States should be dismissed, with prejudice. Alternatively, if the court does not grant the United States' motion for summary judgment, Plaintiff's claims challenging the Navy's tag out procedures, and the claims challenging the design of the McFAUL, and its equipment and appurtenances, should be dismissed for lack of subject matter jurisdiction because these claims challenge conduct that is discretionary and susceptible to policy analysis.

Dated: January 30, 2025                    Respectfully submitted,

                                           UNITED STATES OF AMERICA

                                           ERIK S. SIEBERT
                                           United States Attorney

                              By:          /s/  *Garry D. Hartlieb*
                                           Garry D. Hartlieb, IL Bar No. 6322571
                                           Assistant U.S. Attorney
                                           Office of the United States Attorney
                                           101 West Main Street, Suite 8000
                                           Norfolk, Virginia 23510-1671
                                           Tel: (757) 441-3173
                                           Fax: (757) 441-6689
                                           E-mail: garry.hartlieb@usdoj.gov

                                           BRETT A. SHUMATE
                                           Acting Assistant Attorney General

                              By:          /s/  *Shaun M. Pehl*
                                           Malinda R. Lawrence, ME Bar No. 004351
                                           James R. Whitman, DC Bar No. 987694
                                           Shaun M. Pehl, WA Bar No. 45534
                                           Michelle Delemarre,
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Torts Branch
                                           Aviation, Space & Admiralty Litigation
                                           175 N Street, NE, 8th Floor
                                           Washington, DC 20002
                                           Tel: (202) 307-0033/(202) 305-8049
                                           Fax: (202) 616-4002
                                           E-mail: Malinda.R.Lawrence@usdoj.gov
                                           E-mail: james.whitman@usdoj.gov
                                           E-mail: shaun.pehl@usdoj.gov

                                           *Attorneys for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2025, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of electronic filing (NEF) to the following counsel of record:

Robert J. Haddad, Esq.
Andrew M. Hendrick, Esq.
RULOFF, SWAIN, HADDAD,
MORECOCK,
TALBERT & WOODWARD, P.C.
317 30th Street
Virginia Beach, VA 23451
Telephone: (757) 671-6036
Facsimile: (757) 671-6004
Email: rhaddad@srgslaw.com
Email: ahendrick@srgslaw.com
*Counsel for Douglas I. Hornsby,*
*Administrator of the Estate of Cynthia Gary*

Jennifer Eaton, Esq.
Katherine Lennon Ellis, Esq.
WOODS ROGERS VANDEVENTER
BLACK PLC
101 West Main St., Suite 500
Norfolk, Virginia, 23510
Telephone: 757-446-8600
Fax: 757-446-8670
Email: Jennifer.Eaton@wrvblaw.com
Email: Kate.Lennon@wrvblaw.com
*Attorneys for Defendant, Advanced*
*Integrated Technologies, LLC*

Lynn K. Brugh, IV, Esq.
Jack A. Irvin, Esq.
WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, VA 23219
Telephone: (804) 420-6461
Facsimile: (804) 420-6507
Email: lbrugh@williamsmullen.com
Email: jirvin@williamsmullen.com
*Attorneys for Defendant Metro Machine*
*Corp. d/b/a General Dynamics NASSCO-*
*Norfolk*

By:        /s/  *Shaun M. Pehl*
Shaun M. Pehl, WA Bar No. 45534
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Aviation, Space & Admiralty Litigation
175 N Street, NE, 11th Floor
Washington, DC 20002
Phone: (202) 598-5779
Fax: (202) 616-4002
Email: Malinda.R.Lawrence @usdoj.gov
*Counsel for the United States*